No. 20-15568

—————————

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

—————————

MACKENZIE BROWN,
*Plaintiff–Appellant*

v.

STATE OF ARIZONA, *et al.*,
*Defendants–Appellees.*

—————————

On Appeal from the United States District Court
for the District of Arizona
Civil Action No. 2:17-cv-03536-GMS
The Honorable G. Murray Snow

—————————

**BRIEF OF AMICI CURIAE PROFESSOR PAUL BENDER, ET AL. IN SUPPORT OF
PLAINTIFF-APPELLANT'S REQUEST FOR REVERSAL BEFORE THE NINTH CIRCUIT
EN BANC**

—————————

Gemma Donofrio
RELMAN COLFAX PLLC
1225 19th St. NW, Suite 600
Washington, DC 20036
(202) 728-1888

*Counsel for Amici Curiae*

*Amici Listed on Next Page*

### AMICI CURIAE[1]

**Ian Ayres**
Oscar M. Ruebhausen Professor of Law
Yale Law School

**Kelly Behre**
Director, Family Protection & Legal Assistance Clinic
UC Davis School of Law

**Paul Bender**
Professor of Law
Dean Emeritus
Sandra Day O'Connor College of Law, Arizona State University

**Rachel F. Moran**
Distinguished and Chancellor's Professor of Law
University of California, Irvine School of Law

**Peter Nicolas**
William L. Dwyer Endowed Chair in Law
Adjunct Professor of Music
Adjunct Professor of Gender, Women & Sexuality Studies
Director, Intellectual Property Law & Policy Graduate Program
University of Washington School of Law

**Noah A. Rosenblum**
Assistant Professor of Law
NYU School of Law

---

[1] *Amici* are listed in their individual capacities. Institutional affiliations are listed for identification purposes only.

**Jane K. Stoever**
Clinical Professor of Law
Director, UCI Initiative to End Family Violence
Director, Domestic Violence Clinic
UC Irvine School of Law

**Merle H. Weiner**
Philip H. Knight Professor of Law
University of Oregon School of Law

**Michael J. Wishnie**
William O. Douglas Clinical Professor of Law
Yale Law School

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES...............................................................................v

INTEREST OF *AMICI CURIAE*...................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT............................2

ARGUMENT.....................................................................................................5

    I.   The Text of Title IX Demonstrates That a University Can Have
        Substantial Control Over a Broad Range of Environments. ................5

    II.  The Porous Boundaries of Campus Life Highlight the Extent to Which
        Universities Have Substantial Control Beyond Formal Borders. .........9

CONCLUSION................................................................................................12

CERTIFICATE OF FILING AND SERVICE ..............................................14

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Brown v. Arizona*,
    23 F.4th 1173 (9th Cir. 2022), *vacated and reh'g en banc granted*,
    No. 20-15568, 2022 WL 17546341 (9th Cir. Dec. 9, 2022) ......................*passim*

*Davis v. Monroe Cnty. Bd. of Educ.*,
    526 U.S. 629 (1999)..............................................................................*passim*

*Doe v. Fairfax Cnty. Sch. Bd.*,
    1 F.4th 257 (4th Cr. 2021), *cert. denied*, ---S. Ct.----, 2022 WL
    17085176 (Nov. 21, 2022)......................................................................4

*Fitzgerald v. Barnstable Sch. Comm.*,
    504 F.3d 165 (1st Cir. 2007), *rev'd and remanded on other*
    *grounds*, 555 U.S. 246 (2009) ...............................................................4

*Gebser v. Lago Vista Ind. Sch. Dist.*,
    524 U.S. 274 (1998)...............................................................................2

*Jackson v. Birmingham Bd. of Educ.*,
    544 U.S. 167 (2005)...............................................................................2

*Karasek v. Regents of Univ. of California*,
    956 F.3d 1093 (9th Cir. 2020) ..............................................................4

*Mahanoy Area Sch. Dist. v. B.L.*,
    141 S. Ct. 2038 (2021)...........................................................................9

*Ross v. Blake*,
    578 U.S. 632 (2016)...............................................................................6

*Williams v. Bd. of Regents of Univ. Sys. of Georgia*,
    477 F.3d 1282 (11th Cir. 2007) ............................................................4

**Statutes**

20 U.S.C. § 1681 ...............................................................................2, 5, 6, 7

20 U.S.C. § 1687 ....................................................................................2, 5

Title IX of the Education Amendments of 1972 .............................................*passim*

**Other Authorities**

Nondiscrimination on the Basis of Sex in Education Programs or
    Activities Receiving Federal Financial Assistance, 87 F.R. 41390
    (July 12, 2022) ................................................................................7, 8

Rachael Myrow, *How Stanford Came to Dominate the Landscape in
    Silicon Valley*, KQED, Nov. 4, 2019,
    https://www.kqed.org/news/11781771/how-stanford-became-the-
    largest-landowner-in-silicon-valley. ..................................................10

UC Hastings Law San Francisco, *Campus Life*,
    https://www.uchastings.edu/campus-life/ (last visited Dec. 27,
    2022). ................................................................................................11

UC Hastings Law San Francisco, *Our Location: Heart of the Civic
    Center*, https://www.uchastings.edu/map-directions/ (last visited
    Dec. 27, 2022). ..................................................................................11

UC Hastings Law San Francisco, *Real World Classrooms*,
    https://www.uchastings.edu/academics/experiential-learning-
    opportunities/ (last visited Dec. 27, 2022).........................................11

UC Hastings Law San Francisco, *UC Hastings Law will be known as
    UC Law SF starting in 2023*, https://www.uchastings.edu/new-
    name/ (last visited Dec. 27, 2022). ...................................................11

The University of Arizona, *All About Tucson*,
    https://www.arizona.edu/student-life/tucson (last visited Dec. 27,
    2022) .................................................................................................10

The University of Arizona, *Housing & Residential Life*,
    https://housing.arizona.edu/about-us/about-us (last visited Dec. 27,
    2022) .................................................................................................10

The University of Arizona, *Institutional Equity: Title IX FAQs*,
    https://equity.arizona.edu/title-ix/faqs (last visited Dec. 28, 2022)......................9

The University of Arizona, *University Analytics & Institutional Research: Enrollment*, https://uair.arizona.edu/content/enrollment (last visited Dec. 27, 2022). .................................................................................10

University of Washington, *SafeCampus*, https://www.washington.edu/safecampus/ (last visited Dec. 27, 2022) .............................................................................................................11

## INTEREST OF *AMICI CURIAE*[2]

*Amici curiae* are law school professors and directors of law school clinical programs who specialize in a wide variety of legal subjects, including civil rights, domestic violence, legal history, and statutory interpretation. *Amici* understand the text of Title IX and its application to university campuses throughout the country. And as professors and instructors on a wide variety of campuses, *amici* are uniquely familiar with the porous nature of university campuses, and the extent to which universities have control over individuals and environments that are not limited to formal campus boundaries.

---

[2] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E) and Ninth Circuit Rules 29-2 and 29-3, *amici curiae* state that all parties consented to the filing of this *amici curiae* brief. No party's counsel authored this brief in whole or in part, and no party, party's counsel, or person other than *amici curiae* or their members or counsel contributed money intended to finance the preparation or submission of this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Title IX of the Education Amendments of 1972 ("Title IX") states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a). The statute defines "program or activity" in relevant part as "all of the operations of . . . a college, university, or other postsecondary institution, or a public system of higher education." 20 U.S.C. § 1687(2)(A). And as particularly pertinent here, a school or university can be liable under Title IX "for its *own* decision to remain idle in the face of known student-on-student harassment . . . ." *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 641 (1999) (emphasis in original). *See also Gebser v. Lago Vista Ind. Sch. Dist.*, 524 U.S. 274 (1998) (explaining the deliberate indifference standard under Title IX).

The University of Arizona ("the University") incorrectly argues that it is not liable under Title IX because it did not have substantial control over the environment in which Orlando Bradford sexually harassed Mackenzie Brown. Answering Br. (Dkt. 15) at 23, 29. That is incorrect for two reasons. First, the text of Title IX, a "broadly written general prohibition" on sex discrimination, *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005), illuminates that a university can have substantial control over an off-campus environment. The now-

2

vacated panel majority opinion creates a requirement that, to trigger liability, harassment must occur within the formal borders of a campus or in an off-campus context similar to that on campus, yet no such requirement exists by statute. To the contrary, the statute makes no mention of utilizing a campus as a reference point for whether a school has substantial control of an off-campus context. And as the Supreme Court in *Davis* found, Title IX makes clear that a university can be liable where it "exercises substantial control" over "the context in which the known harassment occurs," in other words, where the university has regulatory authority over the environment. *Davis*, 526 U.S. at 645. Second, Title IX's reach is confirmed by practical realities of university life, where there is often no clear line between the on-campus and off-campus environment. We see the porous nature of campus boundaries every day, as students continually engage in social life, experiential learning, and community service both on and off campus.

The facts at issue here demonstrate that the University had substantial control over the context in which the harassment occurred. The University provided Bradford explicit permission to live in his off-campus housing, a privilege the University had the express ability to revoke at any time. *Brown v. Arizona*, 23 F.4th 1173, 1182 (9th Cir. 2022), *vacated and reh'g en banc granted*, No. 20-15568, 2022 WL 17546341 (9th Cir. Dec. 9, 2022). Bradford's ability to live off campus was provided to him due to "good behavior," and was paid for

3

with his University scholarship. *Id.* at 1184 (Fletcher, J., dissenting). The University's power to revoke Bradford's ability to live in his home, and the fact that University funds paid for the home, clearly constitute indicia of substantial control. In failing to take any action after clear notice that Bradford was sexually harassing female students[3]—and in fact, that he was doing so in University-paid housing—the University was patently, deliberately indifferent to known harassment occurring by a harasser and in an environment over which the University had substantial control. *Davis*, 526 U.S. at 644–46.

Given the text and purpose of Title IX and the porous nature of campus boundaries—coupled with the unambiguous record in this case, demonstrating that

---

[3] This is a pre-assault case, i.e., the University had notice of Bradford's harassment of female students prior to his assault of Ms. Brown, and its liability therefore stems from its deliberate indifference that caused a student to be sexually harassed. *See* 23 F.4th at 1177. In a post-assault Title IX case, several federal courts of appeals have held that a school may be liable if the school's post-assault deliberate indifference to sexual harassment results in deprivation of educational opportunities, even where the student does not suffer additional sexual harassment after reporting. *See, e.g.*, *Williams v. Bd. of Regents of Univ. Sys. of Georgia*, 477 F.3d 1282, 1296 (11th Cir. 2007); *Fitzgerald v. Barnstable Sch. Comm.*, 504 F.3d 165, 172 (1st Cir. 2007), *rev'd and remanded on other grounds*, 555 U.S. 246 (2009); *Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 274 (4th Cr. 2021), *cert. denied*, ---S. Ct.----, 2022 WL 17085176 (Nov. 21, 2022); *see also Karasek v. Regents of Univ. of California*, 956 F.3d 1093, 1106 n.2 (9th Cir. 2020) (declining to address this issue). But given that this is a pre-assault case and the University's deliberate indifference did cause post-notice harassment, this Court need not address that issue.

the University funded Bradford's housing and that the football team would have removed Bradford's permission to live there and revoked his scholarship had they been properly informed of his abuse of students—this Court should reject the University's interpretation of the statute.

## ARGUMENT

### I. The Text of Title IX Demonstrates That a University Can Have Substantial Control Over a Broad Range of Environments.

The text of Title IX shows that a university's liability for sex discrimination is not confined to that university's physical campus, nor is it limited to contexts that a university controls "in the way" that it controls on-campus buildings, as the panel majority suggests. 23 F.4th at 1182. Title IX broadly states that "[no] person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a). The statute further defines "program or activity" to include "*all* of the operations of . . . a college, university, or other postsecondary institution, or a public system of higher education." 20 U.S.C. § 1687(2)(A) (emphasis added).

To the extent that Appellees argue that Title IX only covers on-campus contexts, that is clearly wrong given the plain text of the statute. The "operations" of colleges and universities frequently include off-campus contexts, such as intercollegiate athletics and other intercollegiate competitions, social group homes,

5

scientific research conferences, community service, and experiential coursework. In fact, Congress expressly excluded any "program or activity" related to "Boy or Girl conferences" sponsored by a non-university entity, which necessarily involve students traveling off campus. 20 U.S.C. § 1681(a)(7). Similarly, Congress expressly excluded the "membership practices" of sororities and fraternities— organizations that are frequently located off campus. 20 U.S.C. § 1681(a)(6). If Title IX were largely limited to the edge of campus, Congress would not have needed to include these express carveouts for off-campus conduct. *See Ross v. Blake*, 578 U.S. 632, 638–40 (2016) (stating that "[s]tatutory interpretation, as we always say, begins with the text," and noting that the Supreme Court has rejected creating a carve out to a regime where it is "inconsistent with the uncompromising statutory text" (citing *Porter v. Nussle*, 534 U.S. 516, 520 (2002))).

And to the extent Appellees adopt the panel majority's view that a university must control an off-campus residence "in the way that it controls" on-campus housing or athletic team activities, 23 F.4th at 1182, they are incorrect because whether a context falls under Title IX turns on the type and "degree" of control the university has over that context. *Davis*, 526 U.S. at 644. For instance, a university undoubtedly has a different degree and type of control over an on-campus class than they do over an intercollegiate athletic competition occurring off campus, but the panel majority would concede that a university has substantial control over

6

both environments. *See* 23 F.4th at 1182 (referring to off campus "team or school activities" as activities over which the University has control). It follows naturally, then, that a university does not lack substantial control over an off-campus residence simply because that control is not identical in degree to the control a university exercises over an on-campus residence. *See also* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 87 F.R. 41390 (July 12, 2022) (recognizing that a school can be liable for harassment in an off-campus context where it falls under the school's disciplinary authority).

*Davis* illustrates that the University's narrow vision of control cannot be squared with the text of Title IX. In *Davis*, the Supreme Court rooted its requirement that harassment "take[s] place in a context subject to the [educational institution's] control" in Title IX's prohibition on discrimination "'under' 'the operations of'" that educational institution. 526 U.S. at 645. To illustrate the scope of Section 1681(a), *Davis* explained that "under" in the framework of the statute includes contexts falling under the school's authority, noting that "under" connotes "subject to the authority [of]" and "in or into a condition of subjection, regulation, or subordination." *Id. Davis*'s explanation of Section 1681(a) thus makes clear that a university has the requisite control of an off-campus context that falls under the university's regulatory authority, and accordingly, such a context would be

7

covered by Title IX. *Id.* There is no doubt that a school would exercise such regulatory authority where it can decide whether a student can live in nearby off-campus housing—and can revoke that permission at any time—and the school is funding that housing with a university scholarship. *See* 23 F.4th at 1178.

Noting that universities have an "[o]bligation to address" off-campus conduct under a university's "education program or activity," the Department of Education has issued a proposed rule reaffirming that a school or university can be liable for conduct occurring in off-campus environments "under the school's disciplinary authority." 87 F.R. 41390 (quoting *Davis*, 526 U.S. at 647). The proposed rule that would also make clear "that whether conduct falls under a recipient's education program or activity for purposes of Title IX is not contingent on the geographic location of the underlying conduct . . . ." *Id.* (citing *DeGroote v. Ariz. Bd. of Regents*, No. CV-18-00310-PHX-SRB, 2020 WL 10357074, at *8, (D. Ariz. Feb. 7, 2020)). Additionally, the proposed regulation would clarify that online learning platforms can fall within a university "program or activity," further dispelling any notion that an off-campus context must look identical to the campus environment to fall under Title IX. *Id.*

The University itself appears to advertise to current and prospective students that its Title IX obligations include contexts that fall under its regulatory or disciplinary authority. The University's Title IX Frequently Asked Questions

include whether the University investigates sexual harassment that occurs off campus; in response, the University states that it can investigate if the incident has sufficient ties to the University, and lists examples of sufficient ties, including "if it involves an Arizona student, faculty or staff member, etc."[4] By the University's own admission, then, the involvement of an Arizona student in sexual harassment may constitute "activity" falling under its Title IX obligations.

## II. The Porous Boundaries of Campus Life Highlight the Extent to Which Universities Have Substantial Control Beyond Formal Borders.

The realities of daily life at the University of Arizona and many other institutions illustrate that the school experience is in no way contained within a campus map or to school-sponsored activities. As the Supreme Court noted recently, a "school's regulatory interests remain significant in some off-campus circumstances." *Mahanoy Area Sch. Dist. v. B.L.*, 141 S. Ct. 2038, 2045 (2021). Such circumstances include the "writing of papers," "serious or severe bullying or harassment targeting particular individuals" and "threats aimed at teachers or other students." *Id.* At the University of Arizona, more than 80% of students live off

---

[4] The University of Arizona, *Institutional Equity: Title IX FAQs*, https://equity.arizona.edu/title-ix/faqs (last visited Dec. 28, 2022).

9

campus.[5] It is hard to imagine how the University would function if it only had "substantial control" over the housing of 20% of its students. Moreover, the University promotes its close relationship with Tucson, noting that the University is "at the center" of the city and encouraging students to spend time in the city.[6]

Our experiences on diverse campuses are similar; there is no clear line between on-campus and off-campus life and student experiences center on a broader environment that includes campus and the areas surrounding campus. Students participate in activities on and off campus, live both on campus and in the surrounding area, and socialize on campus as well as in the broader surrounding community. Universities often advertise that the area surrounding campus is a part of university life and a benefit to attending a particular educational institution. Some universities even own extensive property in the city that surrounds them.[7]

---

[5] Approximately 8,000 students live on campus, and the University has more than 40,000 students who are enrolled full time. The University of Arizona, *Housing & Residential Life*, https://housing.arizona.edu/about-us/about-us (last visited Dec. 27, 2022); The University of Arizona, *University Analytics & Institutional Research: Enrollment*, https://uair.arizona.edu/content/enrollment (last visited Dec. 27, 2022).

[6] The University of Arizona, *All About Tucson*, https://www.arizona.edu/student-life/tucson (last visited Dec. 27, 2022).

[7] *See, e.g.*, Rachael Myrow, *How Stanford Came to Dominate the Landscape in Silicon Valley*, KQED, Nov. 4, 2019, https://www.kqed.org/news/11781771/how-stanford-became-the-largest-landowner-in-silicon-valley (identifying Stanford University as one of the largest

Artificial campus boundaries are often irrelevant to the environment over which a university has control. For instance, the University of Washington offers a violence prevention and response program for students "no matter where [they] work or study," acknowledging that the university has authority in several environments beyond the confines of campus.[8] As another example, UC Hastings College of the Law[9] is located on two blocks in the heart of downtown San Francisco.[10] UC Hastings is known for being seamlessly embedded in the city; the law school encourages experiential learning in San Francisco and the Bay Area, and even advertises its integration with the city by stating "Our quad has a cable car."[11] If the panel opinion is adopted, schools could wash their hands of any responsibility under Title IX to address sexual harassment for the majority of

---

landowners in its county and noting that the university leases off campus land to businesses).

[8] University of Washington, *SafeCampus*, https://www.washington.edu/safecampus/ (last visited Dec. 27, 2022).

[9] Effective January 1, 2023, UC Hastings Law will be known as UC College of the Law, San Francisco, or UC Law SF. UC Hastings Law San Francisco, *UC Hastings Law will be known as UC Law SF starting in 2023*, https://www.uchastings.edu/new-name/ (last visited Dec. 27, 2022).

[10] UC Hastings Law San Francisco, *Our Location: Heart of the Civic Center*, https://www.uchastings.edu/map-directions/ (last visited Dec. 27, 2022).

[11] UC Hastings Law San Francisco, *Real World Classrooms*, https://www.uchastings.edu/academics/experiential-learning-opportunities/ (last visited Dec. 27, 2022); UC Hastings Law San Francisco, *Campus Life*, https://www.uchastings.edu/campus-life/ (last visited Dec. 27, 2022).

students who continually cross the physical boundaries of campus to go about their everyday lives. Surely that is not the purpose of Title IX.

## CONCLUSION

Appellees misapply Title IX to this case. Off-campus environments can be controlled by a university, and in fact here, the University funded and explicitly provided Bradford permission to live in his residence. With one swift University action—removal of Bradford's scholarship or revocation of permission to live off campus—the University could have forced Bradford to leave his home, demonstrating its extreme and substantial control over the context in this case.

Further, Appellees fundamentally misunderstand the text and history of Title IX. The statute explicitly states that an educational institution is liable for sex discrimination "under any education program or activity," and its provisions clearly contemplate liability for off-campus contexts that fall under a university's regulatory authority. The text of Title IX contains no requirement that an off-campus context must look akin to an on-campus context for a university to have substantial control, and the realities of university life illuminate that a university can have such control over nearby off-campus housing that is contingent on university permission to live there. Given the broad mandate of Title IX and its clear application to contexts reaching beyond a university's formal campus

12

borders, this Court should reject Appellees' fundamental misinterpretation of Title IX.

Dated: December 30, 2022                    Respectfully submitted,

                                            */s/ Gemma Donofrio*

                                            Gemma Donofrio
                                            RELMAN COLFAX PLLC
                                            1225 19th St. NW, Suite 600
                                            Washington, DC 20036
                                            (202) 728-1888

                                            *Counsel for Amici Curiae*

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on December 30, 2022.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished using the appellate CM/ECF system.

Dated: December 30, 2022                    */s/ Gemma Donofrio*

                                            Gemma Donofrio
                                            *Counsel for Amici*

14

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** _20-15568_____

I am the attorney or self-represented party.

**This brief contains _____2,882_____ words,** including _____0_____ words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** _____s/Gemma Donofrio_____ **Date** __12/30/2022_____
*(use "s/[typed name]" to sign electronically-filed documents)*

15