No. 20-15568

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MACKENZIE BROWN, | On appeal from the United States District Court for the District of Arizona |
| Plaintiff-Appellant, | |
| v. | No. CV17-03536-PHX-GMS |
| STATE OF ARIZONA, et al., | |
| Defendants-Appellees. | |

**APPELLEES' RESPONSE TO BRIEF OF AMICI CURIAE
PROFESSOR PAUL BENDER, ET AL.**

Arizona Attorney General's Office

Claudia Acosta Collings
Assistant Attorney General
416 W. Congress, 2nd Floor
Tucson, AZ 85701-1315
(520) 638-2815 ♦ (520) 628-6050 (fax)
Claudia.Collings@azag.gov

Stephanie Elliott
Assistant Attorney General
2005 N. Central Avenue
Phoenix, AZ 85004-1592
(602) 542-8798 ♦ (602) 542-4085 (fax)
Stephanie.Elliott@azag.gov

Attorneys for Defendants-Appellees

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... iii

INTRODUCTION .....................................................................................................1

ARGUMENT .............................................................................................................3

I. The Supreme Court Recognized Two Separate Control Elements: Control over the Harasser and Control Over the Context in Which the Harassment Occurs. ......................................................................................................3

II. A University's Disciplinary Control Over a Student Does Not Equate to Substantial Control Over that Student's Off-Campus Residence. ..................4

III. A University Does Not Control Private Housing by Giving a Student Financial Aid. ..............................................................................................10

IV. Title IX Does Not Impose an Umbrella of Liability Touching Every Corner of Student Life. ................................................................................12

CONCLUSION ........................................................................................................14

CERTIFICATE OF COMPLIANCE .......................................................................15

CERTIFICATE OF SERVICE ................................................................................16

# TABLE OF AUTHORITIES

Page

Cases

*Brown v. Arizona*,
   23 F.4th 1173 (9th Cir. 2022) ...................................................................6, 9

*Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*,
   526 U.S. 629 (1999)................................................................ 2, 3, 4, 5, 7, 8, 9, 10

*Doe v. Round Valley Unified Sch. Dist.*,
   873 F. Supp. 2d 1124 (D. Ariz. 2012) ..............................................................5

*Gebser v. Lago Vista Indep. Sch. Dist.*,
   524 U.S. 274 (1998)........................................................................................10

*Jackson v. Birmingham Bd. of Educ.*,
   544 U.S. 167 (2005).........................................................................................2

*Mahanoy Area Sch. Dist. V. B.L.*,
   141 S. Ct. 2038 (2021)...................................................................................12

*Roe ex rel. Callahan v. Gustine Unified Sch. Dist.*,
   678 F. Supp. 2d 1008 (E.D. Cal. 2009)............................................................5

*Samuelson v. Or. State Univ.*,
   162 F. Supp. 3d 1123 (D. Or. 2016) aff'd,
   725 Fed. Appx. 598 (9th Cir. 2018)..................................................................5

Statutes

20 U.S.C. § 1681(a) ............................................................................... 1, 3, 4, 5

## INTRODUCTION

Amici Curiae Professors incorrectly view Title IX as imposing a fluid standard of liability that can expand or contract with changes in a student code of conduct or the "practical realities of university life." (Amici Br. ep 9-10.[1]) In their view, a university has substantial control over an environment in which harassment occurs anytime when, or anyplace where a student is subject to any school rule or regulation, and that an "education program or activity" as used in 20 U.S.C. § 1681(a), covers anything a student may pay for with scholarship funds or financial aid. Specifically, they argue that the University of Arizona exercised substantial control over Bradford's private off-campus housing because living off-campus was subject to the football coach's approval and because he supposedly used scholarship money to pay his rent. The Professors' position would result in a moving target of liability that would vary by school and by individual student, based on an endless number of unknown variables.

More importantly, the result that they advocate exceeds the boundaries of Title IX both as written and as definitively interpreted by the United States Supreme Court. Their argument ignores Congress's requirement that liability be premised on discrimination only if it occurs "under an education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Moreover,

---

[1] Citations are to the Court's electronic page ("ep") numbering.

"private damages actions [under Title IX] are available only where recipients of federal funding had adequate notice that they could be liable for the conduct at issue." *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 640 (1999). The text of Title IX does not give a university adequate notice that educational institutions could be held liable for conduct that occurs between students at an off-campus residence over which the university does not exercise control. *See id.*

While the Professors agree in theory that Title IX liability is limited to situations over which a university exercises substantial control, they err in stretching the boundaries of substantial control to include every element of a student's life that can be traced back to the school in any way.[2] The purpose of the two-pronged substantial control element outlined in *Davis* was to limit Title IX liability for student-on-student harassment to misconduct occurring *under the operations* of the school. *Id.* at 645. The Professors' proposition does exactly the opposite—it casts

---

[2] Relying on a misreading of caselaw, the Professors note that Title IX is a "broadly written general prohibition" on sex discrimination and imply that Title IX "broadly" governs all manner of off-campus environments. (Amici Br. ep 9 (quoting *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005)).) In *Jackson*, the Court examined whether retaliation fell within the definition of discrimination under the text of Title IX. 544 U.S. at 172. The Court held that Title IX was intended to employ a "broad" definition of discrimination which included retaliation. *Id.* at 174. It did not suggest that the liability imposed on schools under Title IX should be interpreted so broad as to cover off-campus environments over which the school exerts no control.

2

a wide net over every possible environment where students may interact with each other and would impose upon schools the legal obligation to police those environments. The Court should reject the Professors' argument and instead apply Title IX's plain language as definitively interpreted in *Davis*: a school may be liable only for its own inaction to known harassment occurring in contexts over which it exercises substantial control.

## ARGUMENT

### I. The Supreme Court Recognized Two Separate Control Elements: Control over the Harasser and Control Over the Context in Which the Harassment Occurs.

Title IX provides a private right of action against a federally funded education institution based on student-on-student sexual harassment "where the funding recipient acts with deliberate indifference to known acts of harassment *in its programs or activities*." *Davis*, 526 U.S. at 633 (emphasis added). To establish a Title IX claim, a plaintiff must show that the discrimination occurred within the funding recipient's educational "program or activity." 20 U.S.C. § 1681(a). And "because the harassment must occur 'under' 'the operations of' a funding recipient, the harassment must take place in a context subject to the school['s] . . . control." *Davis*, 526 U.S. at 645 (internal citations omitted). Title IX's "plain language confines the scope of prohibited conduct based on the recipient's degree of control over the harasser and the environment in which the harassment occurs." *Id.* at 644.

3

Thus, a school's damages liability under Title IX is limited to circumstances where the school "exercises substantial control over *both the harasser and the context in which the known harassment occurs*." *Id.* at 645 (emphasis added).

The Supreme Court thus clearly set forth two distinct prongs in the control test: control over the harasser *and* control over the context of the harassment. The two prongs serve distinct purposes. The requirement of control over the harasser derives from the constraint that schools may only be liable for their own misconduct. *Id.* at 644. By contrast, the requirement of control over the context stems from Title IX's express limitation in 20 U.S.C. § 1681(a), that the discrimination must occur under an "education program or activity receiving Federal financial assistance." *Id.* at 645.

In interpreting the plain language of 20 U.S.C. § 1681(a), *Davis* held that damages are allowed only in "limited circumstances," 526 U.S. at 643—i.e., when the school has control over *both* the harasser *and* the context in which the harassment occurs, *id.* at 643-47. As explained in the following sections, accepting the Professors' interpretation would expand liability beyond Title IX's express limitations as recognized in *Davis*.

## II. A University's Disciplinary Control Over a Student Does Not Equate to Substantial Control Over that Student's Off-Campus Residence.

The Professors focus the bulk of their brief on arguing that Title IX liability *can* apply outside the geographic limits of the University. But neither the Appel-

4

lees nor the panel majority argued otherwise.[3] Title IX liability may arise in a context where the school exercises substantial control over an off-campus location or event, such as school-sponsored camps or activities. *See Roe ex rel. Callahan v. Gustine Unified Sch. Dist.*, 678 F. Supp. 2d 1008, 1025 (E.D. Cal. 2009) (holding that high school exercised substantial control over football camp because it sponsored the camp, the camp was a core part of the football program, and school employees supervised the camp).

But although Title IX's limits are not strictly geographical, its private right of action for student-on-student harassment applies *only* to discrimination that has occurred within the funding recipient's educational "program or activity." 20 U.S.C. § 1681(a). That is to say that "the harassment must take place in a context subject to the school['s] . . . control." *Davis*, 526 U.S. at 645. While a school may exercise substantial control over a student, it does not follow that the school exercises substantial control over every environment that a student inhabits merely because the student may be subject to rules that exceed the geographic boundaries of the school.

---

[3] As a *general* rule, a school does not exercise substantial control over harassment that occurs off campus. *Doe v. Round Valley Unified Sch. Dist.*, 873 F. Supp. 2d 1124, 1136 (D. Ariz. 2012); *see also Samuelson v. Or. State Univ.*, 162 F. Supp. 3d 1123, 1131-32 (D. Or. 2016) *aff'd*, 725 Fed. Appx. 598 (9th Cir. 2018) (holding that a university had no control over incidents that occurred off campus "at an apartment that simply happened to be located in the same city as the university"). But there are exceptions, of course.

The Professors argue that because Bradford's ability to live off-campus was subject his football coach's approval under team rules, the University had control over his private, off-campus residence for Title IX purposes. (Amici Br. ep 10-11, 19.) In reality, the University had additional control over Bradford (the harasser) because he was required to abide by additional rules, but that does not equate to control over the residence (the context of Brown's harassment), nor does it obviate the requirement to satisfy the control-over-context element. If it did, the distinction between the two elements of control would disappear.

The Professors' brief implies that Bradford sought and earned the right and was explicitly permitted to live off-campus due to his "good behavior." (Amici Br. ep 10-11 [citing *Brown v. Arizona*, 23 F.4th 1173, 1184 (9th Cir. 2022) (Fletcher, J., dissenting)].) They conflate Bradford's supposed right to live off campus with control over the private residence. First, the Professors overstate the football rules as applied to off-campus housing. Second, they confuse substantial control over the harasser with substantial control over the context of the harassment.

The relevant football team rule provided: "Living off-campus is subject to approval by head coach and position coach. Off-campus subject to moving back on campus." *Brown*, 23 F.4th at 1182. In explaining that rule, the head football coach testified that players were allowed to live off-campus after their freshman year "as long as they were doing okay academically and, you know, not being

6

irresponsible as far as making their appointments and practices and meetings and everything else on time." (Dkt. 9-2 at 51 [ER 0054].) Thus, contrary to the Professors' position, player housing was not a reward for general good behavior but was permitted for all players as long as they passed their classes and showed up to practice on time. These rules are clearly directed at the players themselves, asking whether they are getting passing grades, showing up for appointments, and showing up for practices and meetings on time. In short, the football team rules govern player conduct, not player housing. These rules did not govern players' housing, and their existence did not transform Bradford's private off-campus housing into University property. Once again, the lesson the Supreme Court imparted in *Davis* is that control over the harasser is an element separate from control over the location where the harassment occurs.

The Professors deride the Appellees and the now-vacated majority opinion for supposedly "creat[ing] a requirement that, to trigger liability, harassment must occur within the formal borders of a campus or in an off-campus context similar to that on campus." (Amici Br. ep 10.) The majority created no such requirement (and the Appellees never argued for such a requirement). Instead, while a school retains substantial control over educational programs or activities that occur off campus, *Davis*, 526 U.S. at 646 (finding that a school "retains substantial control over the context in which the harassment occurs" when the abuse "takes place

7

while the students are involved in school activities or otherwise under the supervision of school employees"), the fact that the football team's rules provided authority over Bradford (the harasser) does not equate to University control over his off-campus residence (the context where harassment occurred). The Professors ignore this distinction throughout their brief.

The Professors refer to the Department of Education's 2022 *proposed* rules (Amici Br. ep 14, 15), but those rules have no bearing for several reasons. First, they are not yet in effect. Second, it is doubtful that these new regulations—even if they are approved— could be applied retroactively to Bradford's 2016 conduct. Third, as the Professors point out, this proposed rule change—which would "make clear" that whether conduct falls under a recipient's education program or activity for purposes of Title IX, "is not contingent on the geographic location of the underlying conduct"—relies not on Supreme Court precedent but on the district court's unpublished decision in Brown's companion case, 87 Fed. Reg. 41,402 (July 12, 2022) (citing *DeGroote v. Ariz. Bd. of Regents*, 2020 WL 10357074, at *8 (D. Ariz. Feb. 7, 2020)). And as the Appellees noted in response to the federal government's argument at the petition for rehearing stage, the Department's attempt to extend liability in this situation makes the same mistake that the Professors make here:

> The Department's current interpretation of *Davis*—like its newly proposed regulations—conflates *Davis*'s

8

> two separate and distinct control elements into one by asserting that a claimant seeking monetary damages under Title IX may forego establishing that her harassment occurred in an environment or a context subject to the University's control if the University has exercised control over her harasser through the University's code of conduct. This is contrary to *Davis*'s two-part test, as the majority correctly recognized. *Brown*, 23 F.4th at 1181.

(Appellees' Resp. to Br. of Amicus Curiae U.S. at 7.)

The Professors again seem to confuse Title IX liability with Title IX regulatory obligations by providing a misleading quotation from the University of Arizona Office of Institutional Equity's website. (Amici Br. ep 15-16.) The pertinent question and answer from the website states:

> Q. If an incident of sexual discrimination, harassment, or misconduct occurs off-campus, what can the University do?
>
> A. Individuals are encouraged to report incidents which occur off-campus. The University can investigate if the incident has sufficient ties to the University (if it occurs at a University event, if it involves an Arizona student, faculty or staff member, etc.).
>
> If there are insufficient ties to the University to allow for an investigation, individuals are still encouraged to report so they can be provided with assistance and support.
>
> Individuals are also encouraged to report any potential crime to law enforcement.

9

The University of Arizona, Institutional Equity: Title IX FAQs, https://equity.arizona.edu/title-ix/faqs (last visited Jan. 11, 2023). While the University may *investigate* and *provide services* to students who have been harassed off campus, the website provides no concession whatsoever that off-campus incidents are programs or activities for the purposes of Title IX liability.

As the Supreme Court recognized, Title IX put recipients on notice that, as a condition of receiving federal funding, they must respond appropriately to known sexual harassment of students occurring *in their programs and activities* that excludes students from participating in, or denies them the benefits of, those education programs and activities. *Davis,* 526 U.S. at 640; *Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, 287 (1998). It would be untenable to find now, more than two decades after *Davis*, that Title IX gives schools notice that accepting federal funding imposes liability for students' off-campus conduct having no connection to any school event, program, or activity, merely because the conduct is covered under the school's disciplinary policy or because a school presumptively imposes additional rules on student athletes.

### III. A University Does Not Control Private Housing by Giving a Student Financial Aid.

That Bradford allegedly paid his rent with his scholarship funds does not transform his private residence into University housing. There is no suggestion that a University monitors how scholarship dollars are spent. Nor is there any legal

support for the argument that a University somehow exercises substantial control over anything that a student pays for with scholarship funds or financial aid. If it did, the University's legal obligations would be based on the financial position of each individual student and independent choices made by each individual student.

The Professors argue that "the fact[4] that University funds paid for the home, clearly constitute[s] indicia of substantial control." (Amici Br. ep 11.) This bit of ipse dixit is not true. For example, if a student uses a portion of his financial aid to organize a spring break trip, is the University funding—and controlling—whatever may happen during that entirely extracurricular event? If a student uses scholarship money to make his car payment, does that give the University control over the student's vehicle? What if the student purchases a gun with those funds? It is impossible to imagine how a school could even grasp the magnitude of its liability under Title IX or any law if it must collect and examine receipts and scrutinize the expenditure of every dollar of scholarship or loan money dispersed to its students. Should schools then perform periodic inspections of the off campus housing of every financial aid recipient?

Most importantly, the Professors provide no legal support for the concept that what a student—with no school oversight—chooses to spend financial aid or

---

[4] Whether Bradford in fact used scholarship funds to pay his rent was not definitively established in discovery and is not part of the record in this case.

11

scholarship money on could subject the school to untold amounts of liability. It is an untenable position and unsupported by Title IX, which requires that schools have notice of the actions that subject them to liability.

### IV. Title IX Does Not Impose an Umbrella of Liability Touching Every Corner of Student Life.

The Professors' position is that with the advent of social media, cultural involvement, and campuses that value community integration, the school experience has become "porous." (Amici Br. ep 16.)[5] No longer confined to a geographic campus and a Monday-through-Friday school week, the campus experience bleeds into every element of a young adult's life. Therefore, according to the Professors, a school's Title IX liability also bleeds into every area of a student's life. Under this reasoning, a school is responsible for student-on-student harassment occurring on off-campus internet servers, during community service, or merely in the same city as the University. (*See* Amici Br. ep 16-18.) Fearing that

---

[5] The Professors cite *Mahanoy Area Sch. Dist. V. B.L.*, 141 S. Ct. 2038, 2045 (2021), for the proposition that schools' regulatory interests extend to off-campus circumstances. (Amici Br. ep 16.) *Mahanoy* is inapposite. It is not a Title IX case but a First Amendment case discussing a high schools' ability to regulate off-campus speech "that would materially and substantially disrupt the work and discipline of the school." 141 S. Ct. at 2044. In any event, it does not support the Professors' position. Notably, the Court held that the school's regulation of B.L.'s speech, which occurred "outside of school hours, from a location outside the school," and in which "she did not identify the school in her posts or target any member of the school community with vulgar or abusive language" overstepped the boundaries of the First Amendment. *Id.* at 2047. The Professors similarly overstep the boundaries of Title IX.

"schools could wash their hands of any responsibility under Title IX to address sexual harassment for the majority of students who continually cross the physical boundaries of campus to go about their everyday lives" the Professors propose essentially no boundaries on school liability.  (*Id*. ep 18-19.)

      But Title IX was never intended to and has never been interpreted to force schools to stand *in loco parentis* to students to ensure their safety as they cross the physical boundaries of campus to go about their everyday lives.  As noted above, the Supreme Court has interpreted Title IX as requiring schools to properly prevent and address sex discrimination *under an education program or activity*.  The Professors' argument runs counter to that definitive authority.  And their attempt to expand Title IX and distort the law into one of strict liability for student-on-student harassment is not only unworkable, it is doomed to failure:  Holding schools responsible for harassment over which they have no control would be completely ineffective in addressing the underlying problem of harassment.

## CONCLUSION

For the foregoing reasons and the reasons set forth in Appellee's Answering Brief, this Court should affirm the Judgment.

Respectfully submitted this 19th day of January, 2023.

Arizona Attorney General

/s/ Stephanie Elliott
Claudia Acosta Collings
Stephanie Elliott
Assistant Attorney General
Attorneys for State of Arizona

10940676.3 — LMS17-0459/G201720685-1

## CERTIFICATE OF COMPLIANCE

I am the attorney or self-represented party. I certify that this brief is an amicus brief, contains 3,208 words, and complies with the word limit of Cir. R. 29-2(c)(3).

The brief's type size and typeface comply with Fed. R. App. P. 32(a)(4)-(6).

Dated this 19th day of January, 2023.

/s/ Stephanie Elliott
Claudia Acosta Collings
Stephanie Elliott
Assistant Attorney General

10940676.3 — LMS17-0459/G201720685-1

## CERTIFICATE OF SERVICE

  I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on January 19, 2023.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


By:  <u>s/S. Franz</u>
<u>10940676.3</u> — LMS17-0459/G201720685-1