No. 20-15568

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

MACKENZIE BROWN,

*Plaintiff-Appellant,*

v.

STATE OF ARIZONA, *et al.*

*Defendant-Appellees.*

---

On Appeal from the United States District Court
for the District of Arizona
Case No. 2:17-cv-03536-GMS
The Honorable G. Murray Snow

**APPELLANT'S SUPPLEMENTAL BRIEF**

Jim Davy
ALL RISE TRIAL &
APPELLATE
P.O. Box 15216
Philadelphia, PA 19125
jimdavy@allriselaw.org

Isabel M. Humphrey
HUNTER, HUMPHREY
& YAVITZ PLC
2633 E. Indian School Road
Suite 440
Phoenix, AZ 85016
isabel@hhylaw.com

Alexandra Z. Brodsky
Adele P. Kimmel
Mollie Berkowitz
PUBLIC JUSTICE
1620 L Street NW
Suite 630
Washington, DC 20036
Tel. (202) 797-8600
abrodsky@publicjustice.net

*Attorneys for Plaintiff-Appellant*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... ii

INTRODUCTION .......................................................................................1

ARGUMENT .............................................................................................1

I.    Control-Over-Context is a Functional Standard Rooted in Title IX's Text .....................................................................................1

II.    A Jury Could Find the University Exercised Control Over the Context of the Abuse ............................................................................8

III.   The University's Counterarguments Are Unavailing..................................11

CONCLUSION ........................................................................................15

CERTIFICATE OF COMPLIANCE .......................................................20

CERTIFICATE OF SERVICE ................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Chen ex rel. Chen v. Albany Unified Sch. Dist.*,
  56 F.4th 708 (9th Cir. 2022) ...........................................................7, 10

*C.R. ex rel. Rainville v. Eugene Sch. Dist. 4J*,
  835 F.3d 1142 (9th Cir. 2016) .......................................................7, 10

*Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*,
  526 U.S. 629 (1999)....................................................................*passim*

*DeGroote v. Ariz. Bd. of Regents*,
  No. CV-18-00310-PHX, 2020 WL 10357074
  (D. Ariz. Feb. 7, 2020)....................................................................2, 10

*Feminist Majority Found. v. Hurley*,
  911 F.3d 674 (4th Cir. 2018) .....................................................2, 8, 10

*Hall v. Millersville Univ.*,
  22 F.4th 397 (3d Cir. 2022) ....................................................6, 13, 14

*Jackson v. Birmingham Bd. of Educ.*,
  544 U.S. 167 (2005).............................................................................13

*Mayweathers v. Newland*,
  314 F.3d 1062 (9th Cir. 2002) ...........................................................13

*Oden v. N. Marianas Coll.*,
  440 F.3d 1085 (9th Cir. 2006) ..............................................................4

*Roe ex rel. Callahan v. Gustine Unified Sch. Dist.*,
  678 F.Supp.2d 1008 (E.D. Cal. 2009) ..................................................5

*Ross v. Univ. of Tulsa*,
  859 F.3d 1280 (10th Cir. 2017) .......................................................4, 6

*Rost v. Steamboat Springs RE-2 Sch. Dist.*,
  511 F.3d 1114 (10th Cir. 2008) ............................................................7

*Sherman v. Regents of Univ. of Cal.*,
No. 20-CV-06441, 2022 WL 1137090
(N.D. Cal. Apr. 18, 2022) ...................................................................7

*Simpson v. Univ. of Colo. Boulder*,
500 F.3d 1170 (10th Cir. 2007) ...................................................6, 10

*Souders v. Lucero*,
196 F.3d 1040 (9th Cir. 1999) ...........................................................3

*Upchurch v. Multnomah Univ.*,
No. 3:19-cv-00850, 2021 WL 6622254
(D. Or. Dec. 31, 2021) .......................................................................3

*Vernonia Sch. Dist. 47J v. Acton*,
515 U.S. 646 (1995).............................................................................3

*Weckhorst v. Kan. State Univ.*,
241 F.Supp.3d 1154 (D. Kan. 2017).....................................................5

**Statutes**

20 U.S.C. § 1681(a) ............................................................................2, 14

**Other Authorities**

85 Fed. Reg. 30,026 (May 19, 2020) .......................................................8

15A Am. Jur. 2D *Colleges and Universities* §§ 26-27 .............................3

*Environment*, Merriam-Webster, https://www.merriam-
webster.com/dictionary/environment ..................................................2

iii

**INTRODUCTION**

No one could say the context in which Orlando Bradford nearly killed Mackenzie Brown was, in any real sense, beyond the University's control. The school had the power to regulate conduct in the area surrounding campus, including the team house where Bradford abused Mackenzie. It also created the heightened risk to Mackenzie in that context by, among other things, permitting Bradford to move off campus. The question before this Court en banc is whether Title IX's control requirement is a functional test that reflects reality and the statute's text, or an overly formalistic rule that relies on arbitrary distinctions to produce absurd results. The former is correct.

**ARGUMENT**

**I.     Control-Over-Context is a Functional Standard Rooted in Title IX's Text.**

1. As previously explained, Title IX's "substantial control" requirement stems from the Supreme Court's holding that a school will not be vicariously liable for a student or teacher's harassment. *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 640-41 (1999). Rather, it will only be responsible for its own deliberate indifference that either causes a student to be harassed or makes them vulnerable to further harassment. *Id.* So, if a student is harassed in a context where a school has no way to influence the risk of harassment, or is harassed by a person over whom the school has no control, it cannot be liable under Title IX. *See id.* at

1

645-46. Control thus consists of two related parts: "control over the context in which the harassment occurs" and, "[m]ore importantly, … control over the harasser." *Id.* at 646. At issue in this case is the former.

"The location at which the … harassment occurs is certainly part of a court's calculus in examining [control over] context—but it is not dispositive." *DeGroote v. Ariz. Bd. of Regents*, No. CV-18-00310-PHX, 2020 WL 10357074, at *8 (D. Ariz. Feb. 7, 2020). After all, the Court chose the term "context," not "location." *Davis*, 526 U.S. at 645-46. And the one term *Davis* used synonymously with "context" is "environment," *id.* at 644—a term that evokes "conditions" or "circumstances" defined by more than simple geographic boundaries, *see Environment*, Merriam-Webster, https://www.merriam-webster.com/dictionary/environment ("1: the circumstances, objects, or conditions by which one is surrounded … 2[b]: the aggregate of social and cultural conditions that influence the life of an individual or community").

A school may exercise substantial control over a context by regulating what happens in that environment. *See, e.g.*, *Feminist Majority Found. v. Hurley,* 911 F.3d 674, 687-89 (4th Cir. 2018) (explaining school had substantial control because it could have "exercised control in … ways that might have corrected the hostile environment"). *Davis* connected "control over context" to Title IX's text, 526 U.S. at 645, which forbids, among other things, "discrimination *under* any education program or activity," 20 U.S.C. § 1681(a) (emphasis added). The Court then adopted a

2

series of dictionary definitions of "under" that all boil down to regulatory authority: "'in or into a condition of subjection, regulation, or subordination'; 'subject to the guidance and instruction of[,]' … 'subject to the authority, direction, or supervision of.'" *Davis*, 526 U.S. at 645 (citations omitted).

2. Schools enjoy broad regulatory authority to ensure a safe and productive learning experience for students. *See, e.g.*, *Souders v. Lucero*, 196 F.3d 1040, 1044-45 (9th Cir. 1999) (collecting cases); 15A Am. Jur. 2D *Colleges and Universities* §§ 26-27 (providing examples). They exercise that authority in different ways, using both carrots and sticks.

For example, schools condition privileges, including the privilege to move off campus or participate in athletics, on students' conduct. *See, e.g.*, *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 657 (1995) (noting schools may condition athletic eligibility on student conduct); *Upchurch v. Multnomah Univ.,* No. 3:19-cv-00850, 2021 WL 6622254, at *5 (D. Or. Dec. 31, 2021) (noting conditions school placed on student eligibility for prestigious campus position); PFREB at 13 (noting University retained discretion to grant or deny students permission to move off campus based on their behavior).

Perhaps the most common way schools exercise their regulatory authority is through discipline. *Davis* acknowledged this in summarizing its holding: "We thus

3

conclude that recipients of federal funding may be liable for 'subject[ing]' their students to discrimination where the recipient is deliberately indifferent to known acts of student-on-student sexual harassment *and the harasser is under the school's disciplinary authority*." 526 U.S. at 646-47 (emphasis added). In formulating the liability standard this way, with the last clause standing for the "control" requirement the Court had explained above, *Davis* made clear that disciplinary authority can provide a school with control over both the harasser and the context of the harassment.

That makes sense because disciplinary and other regulatory authority can, as a practical matter, place harassment within a school's control to prevent and remediate. *See, e.g.*, *Ross v. Univ. of Tulsa*, 859 F.3d 1280, 1287 n.5 (10th Cir. 2017) (holding school had sufficient control over context in part because its disciplinary authority meant it could have prevented the rape). Even on campus, disciplinary authority is often the primary way that schools exercise control over a context. When harassment occurs behind a dorm room's closed door, or in a teacher's private office, officials may not exercise contemporaneous physical control sufficient to stop the harasser in the act. *See, e.g.*, *Oden v. N. Marianas Coll.*, 440 F.3d 1085, 1086-87 (9th Cir. 2006) (describing teacher's sexual harassment during one-on-one classes where "no one else was present" to intervene). But they can impose measures that make it more difficult for him to harass a student there again. *See id.* at 1087-88.

4

Schools are often able to exercise similar control over a student or employee's misconduct that occurs away from campus. A school's off-campus disciplinary authority may be particularly strong with respect to rule-breaking during official school activities. *See, e.g.*, *Roe ex rel. Callahan v. Gustine Unified Sch. Dist.*, 678 F.Supp.2d 1008, 1025 (E.D. Cal. 2009) (holding school exercised control over off-campus football camp it sponsored). But, sometimes, that authority will also extend to misconduct within students' and teachers' off-campus residences and similar contexts, especially where that misconduct poses a threat to the school's mission. PFREB at 8-9 (collecting cases).

3. A school's stated policies, including its disciplinary code, are one indicator of the scope of its regulatory authority. *See, e.g.*, *Roe ex rel. Callahan*, 678 F.Supp.2d at 1025 (holding policy extending school disciplinary regulations to off-campus camp demonstrated school's control). But a school handbook should not be read "in a vacuum." US Amicus Br., ECF No. 58 at 12-13. After all, a school might say it has regulatory power that, in practice, could not reduce the risk of harassment in the relevant context. *See id.* Or it might fail to acknowledge power that it in fact possesses.

So, courts also consider whether the school has in fact investigated and sanctioned misconduct, sexual or otherwise, that occurs in the context at issue. *See, e.g.*, *Weckhorst v. Kan. State Univ.*, 241 F.Supp.3d 1154, 1168 (D. Kan. 2017) (holding

university's suspension of fraternity for serving alcohol meant the university exercised control over that fraternity for purposes of Title IX), *aff'd*, 918 F.3d 1094 (10th Cir. 2019). A court might also look to whether a school could have excluded the known harasser from the relevant context through disciplinary or non-disciplinary means. *See, e.g.*, *Ross*, 859 F.3d at 1287 n.5 (holding school exercised control over context because it could have barred assailant from entering premises where rape occurred); *Hall v. Millersville Univ.*, 22 F.4th 397, 408-09 (3d Cir. 2022) (same).

4. Regulatory power to reduce the risk of harassment is not the only way to demonstrate control. For instance, a school also exercises control where it *creates* the heightened risk of abuse in the given context. In *Simpson*, the University of Colorado had a practice of providing female student "[a]mbassadors" to high school athletic recruits, who were promised "a good time." *Simpson v. Univ. of Colo. Boulder*, 500 F.3d 1170, 1173 (10th Cir. 2007). Predictably, some of those female students were raped by recruits and current student-athletes, including at one victim's off-campus apartment. *Id.* The location of the rapes was no obstacle to the plaintiffs' claims. After all, it would be nonsensical to say a school lacked control over the context of rapes that were the direct result of its own course of conduct. *See id.* at 1179.

In its First Amendment student speech cases, this Court has identified other circumstances indicating a nexus between a school and an off-campus context. To

determine whether a school can discipline off-campus speech, this Court created a "flexible and fact-specific" standard that turns on whether the "totality of the circumstances" indicate a "nexus" to the school. *Chen ex rel. Chen v. Albany Unified Sch. Dist.*, 56 F.4th 708, 720 (9th Cir. 2022) (citation omitted). One factor of that test is "the relation between the … *context* of the speech and the school." *Id.* (emphasis added) (citation omitted). *Chen* recently held that this "context" requirement was satisfied where students used Instagram to target classmates with off-campus racial harassment that significantly and predictably affected the school environment and victims' educations. *Id.* at 721-22. This Court also found a sufficient "nexus" where students experienced the off-campus context as part of the school environment, and the harassers and victims encountered each other in that context because of their common enrollment in the school and the school's own practices. *C.R. ex rel. Rainville v. Eugene Sch. Dist. 4J*, 835 F.3d 1142, 1150-51 (9th Cir. 2016).[1]

First Amendment and Title IX "context" inquiries are not identical. But looking to the former to inform the latter is consistent with the Tenth Circuit's formulation of control as turning on whether there is a "nexus between the out-of-school conduct and the school." *Rost v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114,

---

[1] Notably, *Chen* observed that the defendant-school might have been liable if it had failed to address off-campus racial harassment, citing a Title VI case. 56 F.4th at 722; *see also Sherman v. Regents of Univ. of Cal.*, No. 20-CV-06441, 2022 WL 1137090, at *10 (N.D. Cal. Apr. 18, 2022) (noting that, in assessing schools' responsibilities to address racial harassment under Title VI, courts look to *Davis*).

1121 n.1 (10th Cir. 2008). It also comports with the Fourth Circuit's multi-factor, holistic assessment of control, under which a school controlled the context of harassment "on or within the immediate vicinity of … campus" where "the harassment concerned events occurring on campus and specifically targeted … students." *Hurley,* 911 F.3d at 687. Significantly, in reaching this conclusion, the Fourth Circuit relied on First Amendment case law about off-campus student speech. *See id.* at 687 (citing *Kowalski v. Berkeley Cnty. Schs.*, 652 F.3d 565, 573 (4th Cir. 2011)).

## II.    A Jury Could Find the University Exercised Control Over the Context of the Abuse.

"[W]hether … a sexual harassment incident between two students that occurs in an off-campus apartment … is a situation over which the recipient exercises substantial control" is a "fact specific" question. 85 Fed. Reg. 30,026, 30,093 (May 19, 2020). Here, a jury could find the University exercised control over the context of Bradford's abuse of Mackenzie.

1. The first question is what the relevant context is. It might be the team house near campus in which Bradford lived. The Court need not, however, define the relevant context so narrowly. As explained, *Davis* indicates "context" is something broader than the specific location where harassment occurs—something more like the "circumstances" or "conditions" of the abuse. *See supra* p. 2. So, here, the relevant "context" might instead be the campus and "immediate vicinity," *Hurley,* 911

F.3d at 687, where the University permitted a hostile environment for female students to flourish. That is the environment in which students live, learn, socialize with classmates, and otherwise experience University life. *See* NWLC Amicus Br. at 6-7, ECF No. 47. And it is the environment in which Bradford met female classmates and engaged in a course of unchecked harassment, abusing them both on campus and in surrounding residences. 2-ER-112; 2-ER-147–58; 2-ER-196; 2-ER-262–69.

2. Regardless of whether the context is the house or the broader school environment, the University had control over it. *First*, the school had regulatory authority sufficient to ameliorate the threat of harassment. For the reasons explained previously, the University had regulatory authority over the team house—including the power to forbid Bradford from living there—and its authority gave it the power to influence the risk of sexual harassment in that context. PFREB at 13-14. The University also had significant regulatory authority over the broader school environment that it could have used to ensure student safety. It had the power to decide where in that area students could live, under what level of supervision. 2-ER-54. And the University had the power to investigate and discipline misconduct that happened within this context, including Bradford's abuse over Mackenzie and his previous victims. 2-ER-30–31; 3-ER-352. That regulatory authority was sufficient to exercise significant power over the risk of sexual harassment to students within the environment, indicating control over the context.

9

*Second*, a jury could also find that, as in *Simpson*, the University created the conditions that exposed students to sexual violence, thus demonstrating control. *See supra* p. 6 (discussing *Simpson*). Rather than taking steps to stop Bradford's pattern of violence, the University gave him special permission to move into the team house where—away from dorm supervision—it would be even easier for him to abuse classmates. PFREB at 2-3. In doing so, the University not only tolerated but exacerbated the risk to female students, and ensured the threat extended to the environment in which Bradford abused Mackenzie.

*Third*, other factors demonstrate a nexus between the University and the context of the harassment. Bradford's harassment occurred in an area near campus that students experience as part of University life, as in *C.R.*, 835 F.3d at 1150. And he and Mackenzie—who had met during a University extracurricular activity, 2-ER-112–13—interacted in that environment because of their connection to the University and the University's housing practices. That is, "[t]he school[] … brought the students together" in the context in which the harassment occurred. *C.R.*, 835 F.3d at 1151. Further, as in *Chen* and *Hurley*, the off-campus harassment in this case posed a direct threat to students' educations and the University environment. *See Chen*, 56 F.4th at 721-22; *Hurley*, 911 F.3d at 687-89; *see also DeGroote*, 2020 WL 10357074, at *8 (holding University exercised control over context of Bradford's off-campus harassment because his "violence against women … not only threatened

the safety of [his victims], but threatened the safety of the larger University community").

### III. The University's Counterarguments Are Unavailing.

1. The University argues that Mackenzie and the United States conflate control over the harasser and control over the context of the harassment. If that's true, then so did *Davis*. As explained above, *Davis*'s holding used "the school's disciplinary authority" as a shorthand for the full substantial control requirement. *See supra* pp. 3-4 (quoting *Davis*, 526 U.S. at 646-67). In doing so, the Supreme Court made clear disciplinary authority may satisfy both components of that element, and that those components are interrelated.

Plus, disciplinary authority will not always suffice to provide control over context, so there is daylight between the two types of control. Consider, for example, the University's hypothetical. A "male student" enrolled in an Arizona school—let's call him John—"randomly runs into another … student in … the wilds of Alaska … with no university-related function taking place." ECF No. 65 at 5. He assaults the classmate and is criminally convicted, so the school expels him under its policy "requir[ing] that a student be expelled for any felony conviction." *Id.* There, the hypothetical school had some control over John. But its disciplinary authority alone wouldn't give it the power to reduce the risk of harassment to students in that "far-off" context. After all, the school's ability to expel John for a felony conviction could

11

not prevent him from traveling to Alaska or stop him from continuing to assault people he "randomly" meets there. So, no control over context.

The University also contends that the "control over context" and "control over the harasser" requirements serve different purposes. ECF No. 65 at 3. But *Davis* says no such thing. To the contrary, it describes how both forms of control work together to ensure that a recipient is only held liable for its own misconduct, as required by the statute's text. 526 U.S. at 645 (explaining how the recipient can "[o]nly … be said to 'expose' its students to harassment or 'cause' them to undergo it 'under' the recipient's programs" when both control components are satisfied).

And even if the University were right that disciplinary authority alone is never enough to establish control over a context, the school still would not be entitled to summary judgment. Disciplinary authority was not the University's only, or even primary, form of control over the environment in which Mackenzie was abused. *See supra* Part II (discussing forms of control, including non-disciplinary power to prohibit Bradford from moving into team house). The narrowest way for the Court to resolve this appeal, then, would be to hold that a jury could find for Mackenzie on this element given the totality of the circumstances, leaving resolution of control's outer limits to later cases with harder facts.[2]

---

[2] Contrary to the University's telling in its proposed supplemental brief, ECF No. 84 at 10, Title IX and *Davis* provided the University adequate notice that it could be

2. The University fearmongers that Mackenzie and the United States' interpretations would lead to liability in absurd situations. But, in doing so, the University only proves there is no reason to worry. As explained, its own Alaskan hypothetical demonstrates the reasonable limits to Mackenzie and the United States' position. Plus, control is not the only element of a Title IX claim, and the student-victim in the University's hypothetical would lose her Title IX suit even if the school exercised control. Absent additional facts, the student-victim would be unable to meet *Davis*'s actual notice and deliberate indifference requirements. *See* 526 U.S at 650. And even if she could, the school could not have caused the assault because the students "randomly" encountered each other separate from any "university-related function." ECF No. 65 at 5. The University should rest assured that *Davis*'s extremely demanding standard—of which control is just one element—prevents ex-

---

liable for its deliberate indifference here. *See supra* Part I (explaining meaning of control under Title IX and *Davis*); PFREB at 12 (collecting federal government's public interpretations of control requirement). "[T]he Supreme Court has, throughout its Title IX jurisprudence, rejected arguments that [the notice requirement] bars a particular plaintiff's cause of action after finding that a funding recipient's conduct constituted an intentional violation of Title IX." *Hall*, 22 F.4th at 404; *see also Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 182-83 (2005) (similar); *Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002) ("Congress is not required to list every factual instance in which a state will fail to comply with a condition [of federal funding].").

cessive liability. *Hall*, 22 F.4th at 407 (noting narrow interpretation of control requirement is not necessary to avoid excessive liability); NWLC Amicus Br. at 17-18 (same).

3. In sharp contrast to the reasonable results delivered by Mackenzie and the United States' functional standard, the University's position would lead to absurd results incompatible with Title IX's text. Imagine that University administrators, after receiving reports of Bradford's violence, had told Bradford he was welcome to abuse his classmates so long as he did so in his off-campus home and so would not (in their view) expose the University to liability. By its telling, the University could not be liable under those extreme circumstances in which it would have even more directly "subjected" Mackenzie to abuse. 20 U.S.C. § 1681(a).

The University's proposed rule would also result in nonsensical inconsistencies. *Davis* provided an "obvious example" of Title IX liability: "a case in which male students physically threaten their female peers every day, successfully preventing the female students from using a particular school resource," such as "a computer lab." 526 U.S. at 650-51. If the University were right, a school could be liable for its deliberate indifference if the male students physically blocked the girls from opening a door from the school hallway to the lab, but not if they stood right outside the schoolhouse gate. That is hard to square with Title IX's text, which "specifically shield[s students] from being 'excluded from participation in' or 'denied the benefits

14

of'" any federally funded school. *Davis*, 526 U.S. at 650 (quoting 20 U.S.C. § 1681(a)). Either way, the girls miss out on the chance to learn.

## CONCLUSION

For the reasons explained above and in Mackenzie's previous briefing, the Court should reverse the district court's grant of summary judgment and remand for further proceedings.

Dated:          January 31, 2023                Respectfully submitted,

*/s/ Alexandra Z. Brodsky*
Alexandra Z. Brodsky
Adele P. Kimmel
Mollie Berkowitz
PUBLIC JUSTICE
1620 L Street NW
Suite 630
Washington, DC 20036
(202) 797-8600
abrodsky@publicjustice.net

Jim Davy
ALL RISE TRIAL & APPELLATE
P.O. Box 15216
Philadelphia, PA 19125
jimdavy@allriselaw.org

Isabel M. Humphrey
HUNTER, HUMPHREY & YAVITZ PLC
2633 E. Indian School Road
Suite 440
Phoenix, AZ 85016
isabel@hhylaw.com

*Counsel for Plaintiff-Appellant*

15

**CERTIFICATE OF COMPLIANCE**

This motion complies with the type-volume limitation of this Court's order because this brief contains 3,493 words, excluding those parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office 365 in 14-point Times New Roman font.

Dated:     January 31, 2023                    */s/ Alexandra Z. Brodsky*
                                                           Alexandra Z. Brodsky
                                                           *Counsel for Plaintiff-Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on January 31, 2023.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished using the appellate CM/ECF system.

Dated:      January 31, 2023                    */s/ Alexandra Z. Brodsky*
Alexandra Z. Brodsky
*Counsel for Plaintiff-Appellant*