**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MACKENZIE BROWN, a single woman, | No.20-15568 |
| *Plaintiff-Appellant,* | |
| | D.C. No. |
| v. | 2:17-cv-03536-GMS |
| | |
| STATE OF ARIZONA; ARIZONA BOARD OF REGENTS, DBA University of Arizona, a constitutionally created body corporate, | OPINION |
| *Defendants-Appellees,* | |
| and | |
| RICHARD A. RODRIQUEZ; RITA RODRIQUEZ, | |
| *Defendants,* | |
| v. | |
| LIDA DEGROOTE, | |
| *Third-party-plaintiff.* | |

Appeal from the United States District Court
for the District of Arizona
G. Murray Snow, Chief District Judge, Presiding

Argued and Submitted En Banc March 21, 2023
Pasadena, California

Filed September 25, 2023

Before: Mary H. Murguia, Chief Judge, and William A.
Fletcher, Johnnie B. Rawlinson, Milan D. Smith, Jr.,
Jacqueline H. Nguyen, John B. Owens, Michelle T.
Friedland, Ryan D. Nelson, Kenneth K. Lee, Lucy H. Koh
and Jennifer Sung, Circuit Judges.

Opinion by Judge W. Fletcher;
Concurrence by Judge Friedland;
Dissent by Judge Rawlinson;
Dissent by Judge R. Nelson;
Dissent by Judge Lee

## SUMMARY[*]

### Title IX

The en banc court reversed the district court's summary judgment in favor of the University of Arizona and remanded in an action brought under Title IX by Mackenzie Brown.

Orlando Bradford, who was attending the University on a football scholarship, repeatedly and violently assaulted Brown, his fellow student, in an off-campus house where

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Bradford was living with other university football players. At the time of the assault, university officials knew that Bradford had repeatedly and violently assaulted two other female undergraduates the previous year. Brown sued the University under Title IX, contending that the University's actions and omissions in response to Bradford's violent assaults on the other female students deprived her of the full benefits of her education and that an appropriate response would have prevented Bradford's assaults on her.

The en banc court held that to obtain damages under Title IX for student-on-student harassment, a plaintiff must show (1) that the educational institution had substantial control over both the harasser and the context in which the known harassment occurs; (2) that the harassment was so severe, pervasive, and objectively offensive that it denied its victims the equal access to education that Title IX is designed to protect; (3) that a school official with authority to address the alleged discrimination and to institute corrective measures has actual knowledge of the discrimination; (4) that the school acted with deliberate indifference to the harassment; and (5) that the school's deliberate indifference must, at a minimum, cause students to undergo harassment, or make them liable or vulnerable to it. At issue were the first, third, and fourth requirements.

As to the first requirement, the en banc court held that it was clear that the University had substantial disciplinary control over Bradford, the harasser. The en banc court held that the University also had substantial control over the context in which the harassment occurred, even though it occurred off campus, because location is only one factor in determining the control over context. Considering all the circumstances of this case and viewing the facts in the light most favorable to Brown, the en banc court held that Brown

presented sufficient evidence to allow a reasonable factfinder to conclude that the University had substantial control over the context in which Bradford assaulted Brown. The University had control over the off-campus housing in which Bradford was living. In addition, the University's Student Code of Conduct applied to student conduct both on-campus and off-campus, and Bradford was subject to increased supervision through Player Rules specific to football players.

The en banc court held that there also was a sufficient showing as to the third requirement, actual knowledge, and the fourth requirement, deliberate indifference. The en banc court held that evidence in the record would support a conclusion by a reasonable factfinder that University officials had actual knowledge or notice of Bradford's violent assaults, and that Erika Barnes, the University's Title IX liaison within the Athletics Department, was an official who had authority to address Bradford's assaults and to institute corrective measures. A reasonable factfinder also could conclude that Barnes's response amounted to deliberate indifference.

Concurring, Judge Friedland wrote that she concurred in the majority's opinion in its entirety. She wrote separately to address a waiver argument raised in dissent. Judge Friedland wrote that, in proceedings before the three-judge panel, Brown disavowed the argument that the University exercised control over Bradford's off-campus apartment, but a majority of the three-judge panel addressed that theory on its merits anyway. Because the majority's holding on that theory was incorrect, and because Brown raised the issue in supplemental briefing to the en banc court, it was proper for the en banc court to address the issue.

Dissenting, Judge Rawlinson, joined by Judge Lee, wrote that the facts showed that the University had control over Bradford, the harasser, but not over the context in which the harassment occurred.

Dissenting, Judge R. Nelson, joined by Judges Rawlinson and Lee, wrote that, before the district court and before the three-judge panel, Brown expressly disclaimed the position that the University controlled the context of the abuse in Bradford's off-campus house, arguing instead that the control-over-context requirement was met because the University controlled Bradford's previous abuse of two other female students. Therefore, the majority improperly rested its holding on this theory. Judge R. Nelson wrote that the majority got the merits wrong as well, because the evidence showed that the University did not control the context of Bradford's abuse of Brown.

Dissenting, Judge Lee, joined by Judge Rawlinson, wrote that courts have drifted from the text of Title IX, and a criminal act by a student in an off-campus house does not implicate an "education program or activity" under Title IX.

## COUNSEL

Alexandra Z. Brodsky (argued), Adele P. Kimmel, and Mollie Berkowitz, Public Justice PC, Washington, D.C.; Isabel M. Humphrey, Hunter Humphrey & Yavitz PLC, Phoenix, Arizona; Jim Davy, All Rise Trial & Appellate, Philadelphia, Pennsylvania; for Plaintiff-Appellant.

Stephanie S. Elliott (argued), Assistant Attorney General; Mark Brnovich, Arizona Attorney General; Office of the Arizona Attorney General, Phoenix, Arizona; Claudia A. Collings, Assistant Attorney General, Office of the Arizona Attorney General, Tucson, Arizona; for Defendants-Appellees.

Jason Lee (argued) and Kristen Clarke, Assistant Attorneys General; Nicolas Y. Riley, Attorney; United States Department of Justice, Civil Rights Division/ Appellate Section, Washington, D.C.; Lisa Brown, General Counsel; Vanessa Santos and Mary Rohmiller, Attorneys, United States Department of Education, Office of the General Counsel, Washington, D.C.; for Amicus Curiae United States Department of Education.

John C. Clune, Daniel D. Williams, Colleen M. Koch, and Matthew A. Simonsen, Hutchinson Black and Cook LLC, Boulder, Colorado; Shiwali Patel, Hunter Iannucci, Sunu Chandy, and Emily Martin, National Women's Law Center, Washington, D.C.; for Amici Curiae National Women's Law Center and 31 Additional Organizations.

Gemma Donofrio, Relman Colfax PLLC, Washington, D.C, for Amici Curiae Professor Paul Bender, et al.

## OPINION

W. FLETCHER, Circuit Judge:

Orlando Bradford, attending the University of Arizona on a football scholarship, repeatedly and violently assaulted his girlfriend and fellow student Mackenzie Brown over the course of several months in the summer and early fall of 2016. Bradford's last assaults were extremely violent. They took place on two successive nights in September, during Bradford's sophomore year, in an off-campus house where Bradford was living with other university football players. Bradford and the other football players were allowed to live off-campus only because the coaches of the university football team had given them permission to do so. That permission was conditioned on good behavior.

At the time of Bradford's assaults on Brown, university officials knew that Bradford had repeatedly and violently assaulted two other female undergraduates during his freshman year. Despite this knowledge, those officials did not take steps to ensure that Bradford would not be a danger to Brown and other students. Undisputed evidence in the record shows that if Bradford's coaches had been told of his assaults on the two other students, Bradford would have been kicked off the football team, would have lost his athletic scholarship, and likely would have been expelled from the University by the end of his freshman year, months before his assaults on Brown.

Brown sued the University under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–1688, contending that the University's actions and omissions in response to Bradford's violent assaults on two other female students deprived her of the full benefits of her education and

that an appropriate response would have prevented Bradford's assaults on her. For simplicity, this opinion refers to all defendants collectively as the "University."

The district court granted summary judgment to the University, holding as a matter of law that the University did not exercise control over the "context" in which Bradford's abuse of Brown occurred. A divided three-judge panel affirmed in a published opinion. *Brown v. Arizona*, 23 F.4th 1173 (9th Cir. 2022), *vacated by* 56 F.4th 1169 (9th Cir. 2022). We granted rehearing en banc. *Brown*, 56 F. 4th at 1169–70.

We hold that Brown presented sufficient evidence to allow a reasonable factfinder to conclude that a responsible university official exercised sufficient control over the "context" in which Bradford attacked Brown to support liability under Title IX. *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 645 (1999). We further hold that she presented sufficient evidence to allow a reasonable factfinder to conclude that the University had "actual knowledge" of facts that required an appropriate response, and that a university official's failure to escalate reports of Bradford's actions was a "clearly unreasonable" response demonstrating the University's "deliberate indifference." *Id.* at 642–43, 648–49; *see also Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998).

## I. Factual Background

In reviewing the district court's grant of summary judgment for the University, we view disputed evidence in the light most favorable to Brown, the non-moving party. *See Karasek v. Regents of Univ. of Cal.*, 956 F.3d 1093, 1104 (9th Cir. 2020) (citing *Tauscher v. Phx. Bd. of Realtors, Inc.*,

931 F.3d 959, 962 (9th Cir. 2019)).  The evidence in the record is largely undisputed.

Orlando Bradford enrolled as a freshman at the University of Arizona in the fall of 2015.  He played on the football team and attended the University on an athletic scholarship.  As will be described in greater detail below, during his time at the University, Bradford violently assaulted three women:  Student A, Lida DeGroote, and plaintiff Mackenzie Brown.  During his freshman year, he assaulted Student A multiple times and DeGroote over 100 times.  In the summer after his freshman year and in the fall of his sophomore year, he assaulted Brown between four and ten times.

University officials learned of Bradford's violent assaults on Student A and DeGroote during Bradford's freshman year.  As a result of Bradford's assaults on Student A, the University issued a "no contact" order in April of his freshman year, forbidding him from contacting Student A either on or off campus.  University officials never told the University Athletic Director or Bradford's football coaches of his assaults on Student A or DeGroote.

Bradford's coaches gave him permission to live off campus for his sophomore year.  On two successive nights that fall, in the off-campus house where he was living, Bradford dragged Brown by her hair, locked her in his room, and scratched, hit, kicked, and choked her.  It is undisputed that if university officials had told Bradford's coaches of his violent assaults on Student A and DeGroote, Bradford would have lost his football scholarship, been kicked off the football team, and likely been expelled from the University by the end of his freshman year.

### A. Student A and Lida DeGroote

Student A was a member of the university softball team. She and Bradford met as high school students during an athletic recruiting trip to the University in January 2015. The University first learned about Bradford's violence against Student A in the fall of 2015, at the start of their freshman year. On September 21, 2015, from the window of another building, four students saw Bradford and Student A physically fighting in a dormitory study room. The students knocked on the Resident Adviser's ("RA") door and told him what they had seen. The RA went to the other building to investigate. The RA talked with Bradford alone while Student A waited outside in the hallway. Bradford told the RA that the two of them were "just joking" and that Student A "was just mad at [him] regarding a situation that happened earlier."

The RA contacted the on-call University Community Director who instructed the RA not to call the police. The RA told university administrators that "this may have started off as a very serious physical and verbal altercation between . . . Bradford and . . . Student A." The Community Director later spoke to Bradford and Student A together. He never talked to Student A alone. The Community Director wrote in a report that Bradford and Student A told him that they were "just joking" and "agreed that they w[ould] not engage in this type of behavior in the future." An incident report was filed in "Advocate," the University's case management system.

In late 2015, Student A's parents learned of her abusive relationship with Bradford. A university police report recounted that Student A's parents had told her head softball coach about Bradford's violence against her after they had

broken up in November 2015. The coach recounted in a deposition that Student A's mother had called him in January 2016 and had told him that she and Student A's father were concerned about their daughter's relationship with Bradford and that they were relieved that they had broken up. The coach maintained in his deposition that he was unaware of any specific abuse and that Student A's mother did not tell him in her January call what had disturbed them about Student A's relationship with Bradford.

In January 2016, after his conversation with Student A's mother, the softball coach called Erika Barnes, the University's Title IX liaison within the Athletics Department. Barnes's formal title was Senior Associate Athletics Director, Senior Woman Administrator, and Deputy Title IX Coordinator for Athletics. Barnes recounted in her deposition that the coach informed her that "Student A and her boyfriend broke up," that it was "not a good situation," and that Student A was "really upset." Barnes told the coach that she wanted Student A to meet with a school psychologist. She informed the psychologist that she wanted Student A to meet with her.

Neither Barnes nor the softball coach contacted the University Athletic Director or anyone on the football coaching staff.

Sometime after January, Bradford and Student A began to see each other again. On March 22, 2016, Student A arrived at a study hall with a black eye and finger marks on the side of her neck. Two of her teammates went to talk to the head softball coach. They told him that in the fall of 2015, Bradford had pushed Student A up against a wall, put his hands around her neck, and choked her. The teammates also told him that Student A now had a black eye and finger

marks on her neck.  One of them recounted that the coach told them that he knew about the situation with Student A and Bradford, and about efforts to keep the two apart.

When Student A arrived at softball practice that day, an assistant softball coach saw the black eye and overheard conversations among the players saying that Student A's boyfriend may have been responsible.  He asked Student A what had happened.  She replied that she had been hit by a door.  The assistant softball coach called Barnes later that day.

On March 23, the next day, the head softball coach told Student A's two teammates that they should meet with Barnes and tell her everything they had told him.  The two teammates met with Barnes that afternoon.  Barnes took detailed notes of the conversation.  The teammates told Barnes that Student A had told them that in the fall Bradford had pushed her up against the wall and choked her.  They also described Student A's current black eye and the finger marks on her neck.  They told Barnes that Bradford had "threatened" Student A that if she reported the abuse, he would send compromising pictures of her "to her mother, grandmother, and everyone."

The softball teammates also told Barnes that they had heard that Bradford was hitting another girlfriend, Lida DeGroote, and that DeGroote often had bruises and marks all over her body.  According to the notes taken by Barnes, the teammates reported hearing that Bradford had sent to unspecified persons a video "of Lida & O.B. [Orlando Bradford] having sex," and that DeGroote's friends say that "he hits her often."  They reported hearing that in front of others Bradford had kicked and thrown DeGroote's dog into another room.  The teammates told Barnes that Bradford's

university roommate and best friend from high school in Louisiana had warned them that Bradford "had a violent past," that Bradford was "not afraid to hurt someone," and that "[people] need to be careful."

On March 24, Barnes called Student A into her office and asked her about her black eye.  Student A reported that she was clumsy and had run into a door.  Barnes then accompanied Student A to another building to meet with Susan Wilson, a Senior Title IX Investigator employed by the University, to "hear about [her] options" if she ever decided to file a complaint against Bradford.  Barnes sat in on the meeting with Wilson.  Barnes testified in her deposition that she had told Wilson about Student A's black eye and Student A's story that she had been hit by a door. Wilson testified in her deposition that she did not see a black eye and did not ask Student A about a black eye.  Barnes and Wilson both testified that Student A told Wilson that Bradford had choked her.  Neither Barnes nor Wilson asked follow-up questions about the choking.

When Barnes returned to her office after the meeting with Wilson and Student A, she photocopied the notes she had taken during her interview with Student A's two softball teammates the previous day.  She sent the notes to Wilson and Dean of Students Kendal Washington White.

Neither Barnes nor Wilson in the University's Title IX office, nor anyone in the Dean of Students office, contacted the University Athletic Director or anyone on the football coaching staff about Bradford's assaults on Student A and DeGroote.

In her meeting with Barnes and Wilson, Student A had told them that Bradford might be living with a student named "Lida."  Barnes and Wilson thought that Student A might

have been referring to Lida DeGroote because, as Wilson stated in her deposition, "Lida's an unusual name." Barnes had already been in contact with DeGroote and her mother about various things, including credits for an internship. Wilson knew that Chrissy Lieberman, Associate Dean of Students, was "actively meeting and working with Lida DeGroote" concerning academic matters. Wilson went to Lieberman's office and told her that a student by the name of Lida had been mentioned by another student and that DeGroote might be in a "concerning relationship."

Lieberman met with DeGroote on March 25, the next day, but the focus of the meeting was an academic matter. Lieberman tried indirectly to get DeGroote to talk about any other problems she might be having, but she did not ask DeGroote directly about her relationship with Bradford. DeGroote did not volunteer any information.

On Saturday night, April 9, Bradford went to Student A's dormitory room. He was intoxicated. For nearly two hours, he banged on Student A's door yelling at her to let him in. Student A refused to open the door and repeatedly told Bradford to leave. Bradford finally left at about 1:30 a.m.

On April 10, the next morning, Student A's softball coach called Barnes to tell her about the incident in the dormitory. Barnes contacted Student A and asked if she wanted to call the police. When Student A replied that she did, Barnes called the University Police Department. Later that day, a university police officer met in Barnes's office with Student A and Barnes. Student A told them about the door-banging incident and about Bradford's previous assaults. Student A said that on at least three occasions Bradford had choked her to the point that she could not

breathe.  Student A told them that she wanted to obtain a protective order.

Later that same day, Barnes called Greg Byrne, the University Athletic Director.  Barnes testified in her deposition that she told Byrne only about the door-banging incident.  Barnes did not tell Byrne about Student A's black eye, the finger marks on her neck, or the three choking incidents.  Nor did Barnes tell Byrne about the reports that Bradford had been assaulting DeGroote.

Byrne told Barnes that he would contact the head football coach, Richard Rodriguez.  Because Rodriguez was traveling that day, Byrne spoke to Bradford's position coach instead.  The position coach and Byrne met with Bradford. They discussed the door-banging incident and gave Bradford "a lecture on underage drinking."  The position coach later talked to head coach Rodriguez about the door-banging incident.  The position coach testified in his deposition that Bradford received three days of what he characterized as "physical punishment" for violating the team's underage drinking rules.

On April 11, 2016, on behalf of Student A, Wilson issued a no-contact order to Bradford.  In relevant part, the order provided:  "You are prohibited from having any contact with Student A . . . .  This directive applies to both on and off campus contact."  Dean of Students White was informed that a no-contact order would be sent to Bradford.  Bradford was reassigned to another dormitory for the remainder of his freshman year.

The football team's Player Rules required freshmen to live in a university dormitory.  DeGroote testified in her deposition that even though Bradford was supposed to have been living in Student A's dormitory, in fact he had been

staying at DeGroote's house on "most nights" from January to April.  Instead of moving to his assigned room in the new dormitory in April, Bradford moved into a teammate's off-campus house for the remainder of his freshman year.

On May 10, 2016, Lida DeGroote's mother spoke on the telephone with Associate Dean Lieberman about DeGroote's academic matters.  As noted above, Lieberman had previously been alerted by Wilson that DeGroote was in a "concerning relationship."  During the conversation, DeGroote's mother brought up the issue of DeGroote's safety.  DeGroote's mother did not mention Bradford by name.  She testified in her deposition that she told Lieberman:  "Now we have another issue with her safety.  I believe you saw the bruises on her when she was in there."  The reference was to bruises that Lieberman should have been able to observe during a meeting with DeGroote a month before.  Lieberman did not respond.  DeGroote's mother testified it was "just crickets," an "uncomfortable" silence.

## B. Mackenzie Brown

Bradford started dating Mackenzie Brown in February 2016 while they were both freshmen.  He started to physically abuse Brown during the summer of 2016 while she was at the University for summer session.  By that summer, Bradford had moved into a different off-campus house that he shared with other members of the football team.

Bradford needed permission from his coaches to move to an off-campus house after his freshman year.  Head football coach Rodriguez testified in his deposition that football players other than freshmen were governed by Player Rule 15.  The Rule provided:  "Living off-campus is

subject to approval by head coach and position coach."
Rodriguez testified that he could require players to move
back on campus if they behaved inappropriately. He
testified: "I . . . kind of hung that over them, like, 'Listen, if
you are not being responsible in your appointments or
whatever, then we can tell you to, you know, move back on
campus.'"

Brown testified in her deposition that Bradford
physically abused her between four and ten times during
their relationship. She testified that Bradford "would get
upset about little things." On one occasion during the
summer, Brown was in Phoenix where her father lived.
Bradford texted Brown, but Brown did not see the text right
away. Bradford did not believe her when she replied later
that she had not seen the text. "He told me I needed to leave
where I was in Phoenix, even though he wasn't [t]here. And
I was like: No I'm not leaving. I'm in Phoenix. You're in
Tucson." In August 2016, Bradford gave Brown a black eye:
"He was upset about something, and I wasn't saying
anything back. . . . And he said: You don't care. And he
tried to like slap my hand off of my face, or something, or
slap my face. And he hit my eye and then I had a black eye."
On another occasion, while they were at a Goodyear Tire
store, Brown was scrolling through her contacts on her
phone. Bradford saw the name "Josh" and asked her, "Oh,
who is that?" Brown told Bradford that Josh was her work
supervisor. "That made him upset. And then he like grabbed
my arm and dug his nails into my arm. I have a scar."

Bradford sent threatening texts to Brown. After Brown
refused to leave where she was in Phoenix, he texted her,
"You're disrespecting me. I'm going to show you what
happens to people who disrespect me." On another
occasion, when Brown refused to use a phone application to

share her location with him, Bradford texted her: "You're going to make me break your fucking face."

Bradford's abuse escalated in the fall. On September 12, 2016, Bradford purported to believe that Brown had scratched his car. Bradford and Brown were at Bradford's off-campus house where he lived with other football players. Brown tried to go home, but Bradford would not let her leave. She testified in her deposition:

> [H]e like was trying to pull me in and I didn't want to go, so I was like trying to stop myself like plant my feet, and he pulled me into the house. And then open the door, and then he pushed me on the floor. . . . And then he was yelling. And then he slapped me and I hit my head on the cupboard[.] . . . [A]nd then he started like dragging me by my hair to the stairs. . . . And then like he was choking me . . . on the staircase. . . . Then he said, . . . Say goodbye to your mom. You're never going to talk to her again. . . . [T]hen he took me upstairs . . . and he like locked the door and took off his shirt. And he said: You're about to make me real mad. And . . . he was like hitting me up side my head and pushing me on the ground and hitting on my arms and my legs.

Bradford later took Brown to Safeway to get Tylenol. Brown asked to go home, but Bradford refused. Brown spent the night at Bradford's house. Bradford took her home the next morning.

Brown was at Bradford's house again the next day. Bradford went to Wendy's with some friends. Brown told him she did not want anything, but Bradford brought her back a "Frosty." Brown said she did not want it, so Bradford put it in the freezer. Another football player who lived in the house told Brown that it was "messed up" that she would not eat the Frosty, so Brown responded, "Okay, I'll take a bite." Bradford became angry, saying, "You listen to other people now instead of me."

Brown said she was going to call an Uber and go home. Bradford refused to allow her to go upstairs to get her things. Brown went out to the sidewalk and called an Uber. Bradford came outside, tried to take her phone, and grabbed her by the stomach to try to pull her into the house. He then convinced her to get into his car. "[T]hen he kind of like smacked me in my face and then like grabbed my hair, and then my nose started bleeding." Brown went back inside to clean up the blood. Bradford followed Brown inside and began looking through Brown's phone. He found Brown's brother's name with a phone number from a different area code than the rest of Brown's family's phone numbers. Bradford refused to believe that it was her brother's number. She testified in her deposition: "And so then he got upset, and that's like when he started hitting me again." Sometime later, Bradford finally fell asleep.

Brown stayed awake most of the night, waiting until she could call her mother. After Bradford dropped Brown off at her house in the morning on his way to football practice, Brown called her mother. Her mother called the police and University Athletic Director Byrne.

Brown went to her family doctor on September 16.  She presented with:

> psychological trauma, burst blood vessels in the eye, bruising on the lower part of the neck, likely concussion, intractable acute post-traumatic headache, neck pain from direct trauma (kicking and hitting) as well as from strangulation, upper back pain, left rib pain with breathing and movement, left upper abdominal pain, abdominal contusions, . . . head tenderness from hitting a cabinet and being punched in the head during the attack, scratches on her forehead, upper arm contusions, circular contusions circling the base of her neck, and contusions with tenderness over her left rib area.

Bradford was arrested on September 14.  He received an interim suspension notification from the University that same day "due to [his] behavior that has been determined to present a substantial risk to members of the university community."   When DeGroote's mother learned that Bradford was in police custody, she left an anonymous tip with the Tucson Police Department that Bradford had been abusing DeGroote.   Bradford was expelled from the University on October 14.  He was criminally charged based on his assaults on Brown and DeGroote, and he pleaded guilty to two counts of felony aggravated assault and domestic violence.   In November 2017, Bradford sentenced to five years in prison.

## II. Procedural History

DeGroote and Brown each sued the University under Title IX in the federal District Court for the District of Arizona.  Their cases were assigned to different judges.

The district judge in DeGroote's case denied DeGroote's and the University's cross-motions for summary judgment. *DeGroote v. Ariz. Bd. of Regents*, No. CV-18-00310-PHX-SRB, 2020 WL 10357074, at *12 (D. Ariz. Feb. 7, 2020). The judge held that DeGroote had presented sufficient evidence to allow a reasonable factfinder to conclude that the University: (1) had actual knowledge of Bradford's abuse of DeGroote; (2) exercised substantial control over the "context" of Bradford's abuse of DeGroote, including abuse that took place off-campus; and (3) had shown "deliberate indifference" to Bradford's abuse. *Id.* The parties settled before trial.

The district judge in Brown's case granted summary judgment to the University.  The judge held that Brown's claim failed because none of the abuse, including the assaults on September 12 and 13, was in a "context" over which the University had substantial control.  The judge concluded:

> *Plaintiff does not allege that any of her abuse occurred on campus or in any other setting under Defendants' control.*  While it is undeniable that Defendants exercised substantial control over Bradford, *Plaintiff has not offered any evidence that Defendants exercised control over the context in which her abuse occurred.*  Defendants therefore

cannot be liable for Plaintiff's harassment under Title IX.

*Brown v. Arizona*, No. CV-17-03536-PHX-GMS, 2020 WL 1170838, at \*3 (D. Ariz. Mar. 11, 2020) (emphasis added). The judge did not reach any other issue.

Brown timely appealed. Brown argued in her briefs to the three-judge panel of our court that because the University had substantial control over the context of Bradford's known harassment of Student A and DeGroote, it necessarily had control over the context of Bradford's September 12 and 13 assaults on Brown in his off-campus house. Before our en banc court, Brown made a narrower argument. She contended that under the circumstances of this case in which the University had extensive authority over Bradford, including control over whether he could live off campus, the University had "substantial control" over the "context" in which he assaulted Brown.

We are free to address this narrower argument. First, "we have the authority and discretion to decide questions first raised in a petition for rehearing en banc." *United States v. Hernandez-Estrada*, 749 F.3d 1154, 1159 (9th Cir. 2014) (en banc). Brown raised the question of whether the University had control over the off-campus contexts where the assaults occurred in her petition for review en banc, and the University addressed the question in its response to the petition. The party presentation principle that our colleague Judge Nelson identifies in his dissent does not govern at the en banc stage here, where the parties "themselves have 'frame[d] the issue for decision.'" *Lee v. Fisher*, 70 F.4th 1129, 1154 (9th Cir. 2023) (en banc) (quoting *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020)); *see also Hernandez-Estrada*, 749 F.3d at 1159.

Second, while Brown has made a narrower argument, she has not raised a new claim. *See United States v. Pallares-Galan*, 359 F.3d 1088, 1095 (9th Cir. 2004) ("As the Supreme Court has made clear, it is claims that are deemed waived or forfeited, not arguments."). Rather, Brown raised an "alternative argument to support what has been [her] consistent claim from the beginning: that" the University violated Title IX by failing to prevent Bradford's abuse of her. *Id.* *United States v. Sineneng-Smith*, 140 S. Ct. at 1580–82, is not to the contrary. The defendant in *Sineneng-Smith* initially claimed that her conduct was not proscribed by the criminal statute; in the alternative, she claimed that the statute was vague and did not provide fair notice that her conduct was criminal. *Id.* at 1580. She raised those same issues on appeal. *Id.* The three-judge panel then ordered further briefing from three non-party organizations on an issue that had never been raised by Sineneng-Smith. *Id.* at 1580–81. Unlike in *Sineneng-Smith*, our en banc panel has neither turned over the appeal to non-parties, nor "radical[ly] transform[ed]" the case by raising a new issue. *Id.* at 1581–82.

## III. Standard of Review

We review the district court's grant of summary judgment de novo. *Karasek v. Regents of Univ. of Cal.*, 956 F.3d 1093, 1104 (9th Cir. 2020). We determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the University is entitled to judgment as a matter of law. *Id.*; Fed. R. Civ. P. 56(c). "When determining whether a genuine issue of material fact exists, we 'must draw all justifiable inferences in favor of the nonmoving party.'" *Howard v. HMK Holdings, LLC*, 988 F.3d 1185, 1189 (9th Cir. 2021) (quoting *Suzuki Motor Corp. v. Consumers Union*

*of U.S., Inc.*, 330 F.3d 1110, 1132 (9th Cir. 2003)). "An issue of material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party." *Karasek*, 956 F.3d at 1104 (citation omitted).

## IV. Discussion

Subject to exceptions not relevant here, Title IX provides: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1998), and *Davis ex rel. LaShonda D. v. Monroe County Board of Education*, 526 U.S. 629 (1999), set out the guideposts for liability under Title IX. To obtain damages under Title IX for student-on-student harassment, a plaintiff must show (1) that the educational institution had "substantial control over both the harasser and the context in which the known harassment occurs," *Davis*, 526 U.S. at 645; (2) that the harassment was so "severe, pervasive, and objectively offensive that it denies its victims the equal access to education that Title IX is designed to protect," *id.* at 652; (3) that a school official with "authority to address the alleged discrimination and to institute corrective measures . . . has actual knowledge of [the] discrimination," *Gebser*, 524 U.S. at 290; (4) that the school acted with "deliberate indifference" to the harassment, *Davis*, 526 U.S. at 633; and (5) that the school's "[d]eliberate indifference 'must, at a minimum, cause students to undergo harassment, or make them liable or vulnerable to it,'" *Grabowski v. Arizona Board of Regents*, 69 F.4th 1110, 1120 (9th Cir. 2023) (quoting *Davis*, 526 U.S. at 645).

Because we review the district court's grant of summary judgment de novo and because we can "affirm on any ground supported by the record," including a ground upon which the district court did not rely, *see Olson v. Morris*, 188 F.3d 1083, 1085 (9th Cir. 1999), the University asks us to hold that Brown has failed to satisfy the first, third, and fourth requirements—"substantial control" over the "context" of the harassment, "actual knowledge," and "deliberate indifference." We discuss these three requirements in turn.

A. "Substantial Control" over the "Context"

The Supreme Court held in *Davis* that a damages remedy is not available under Title IX unless the defendant had "substantial control" over both the harasser and the "context" in which the harassment occurred. 526 U.S. at 645. The plaintiff in *Davis* had been sexually harassed by another student at school. *Id.* at 633–35. The Court held that the school could be liable for failing to respond to complaints by the plaintiff and other students about the conduct of the harasser. *Id.* at 646–47, 649. The Court limited a school's liability for student-on-student sexual harassment, however, to circumstances where the school "exercises substantial control over both the harasser and the context in which the known harassment occurs." *Id.* at 645. Justice O'Connor wrote for the Court:

> The statute's plain language confines the scope of prohibited conduct *based on the recipient's degree of control over the harasser and the environment in which the harassment occurs.* . . . [B]ecause the harassment must occur "under" "the operations of" a funding recipient, *the*

> *harassment must take place in a context subject to the school district's control*.

*Id.* at 644–45 (quotation marks in original) (emphasis added) (citations omitted).

The Court in *Davis* did not define "context," but its meaning may be inferred from several passages in its opinion.  First, the Court explained that where the harassment occurs "during school hours and on school grounds," the misconduct takes place "under" an "operation" of the school.  *Id.* at 646.  Second, the Court cited with approval a Seventh Circuit case in which the court had "[found] liability where [the] school fail[ed] to respond properly to 'student-on-student sexual harassment that takes place while the students are involved in school activities *or otherwise under the supervision of school employees*.'"  *Id.* (quoting *Doe v. Univ. of Ill.*, 138 F.3d 653, 661 (7th Cir. 1998)) (emphasis added).  Finally, the Court articulated its holding on the "control" element:  "We thus conclude that recipients of federal funding may be liable for 'subject[ing]' their students to discrimination where the recipient is deliberately indifferent to known acts of student-on-student sexual harassment and *the harasser is under the school's disciplinary authority*."  *Id.* at 646–47 (alteration in original) (emphasis added).

These passages make clear that while the physical location of the harassment can be an important indicator of the school's control over the "context" of the alleged harassment, a key consideration is whether the school has some form of disciplinary authority over the harasser in the setting in which the harassment takes place.  *See id.* at 644 ("Deliberate indifference makes sense as a theory of direct liability under Title IX only where the funding recipient has

some control over the alleged harassment. A recipient cannot be directly liable for its indifference *where it lacks the authority to take remedial action*." (emphasis added)). That setting could be a school playground. But, depending on the circumstances, it could equally well be an off-campus field trip, an off-campus research project in a laboratory not owned by the school, or an off-campus residence. If the harassment occurs in such a setting—that is, in a "context" over which the institution has substantial control—the institution may be held liable for deliberate indifference under Title IX even though the harassment takes place off the physical property of the institution.

In the case before us, it is clear that the University had substantial disciplinary control over Bradford, the harasser. The disputed question is whether it had substantial control over the context in which the harassment occurred. Fortunately, we do not write on a clean slate. Engaging in fact-specific inquiries, a number of courts have concluded that liability attaches under Title IX when harassment occurs off campus, so long as the educational institution has sufficient control over both the "harasser" and the "context" in which the harassment takes place.

In *Simpson v. University of Colorado Boulder*, 500 F.3d 1170 (10th Cir. 2007) (Hartz, McKay & Gorsuch, JJ.), two female undergraduates were sexually assaulted in an off-campus apartment by members of the university football team and by high school students who were being recruited for the team. *Id.* at 1172–73. The court recognized that the sexual assaults took place in a "context" over which the university had "substantial control," even though they took

place in the off-campus apartment of one of the plaintiffs. *Id.* at 1173, 1177–78, 1785. The court wrote:

> The CU football team recruited talented high-school players each fall by bringing them to campus. Part of the sales effort was to show recruits "a good time." To this end, recruits were paired with female "Ambassadors," who showed them around campus, and player-hosts, who were responsible for the recruits' entertainment. At least some of the recruits who came to [the plaintiff's] apartment had been promised an opportunity to have sex.

*Id.* at 1173.

Reversing the district court's grant of summary judgment to the university, the Tenth Circuit held that plaintiffs had presented evidence sufficient to support a jury verdict under Title IX. *Id.* at 1185. The Tenth Circuit, describing the reach of Title IX, wrote that "[i]mplementation of an official policy can certainly be a circumstance in which the recipient exercises significant 'control over the harasser and the environment in which the harassment occurs.'" *Id.* at 1178 (quoting *Davis*, 526 U.S. at 644). Viewing the evidence in the light most favorable to plaintiffs, the court held that the university had a policy of showing recruits "a good time"; that the sexual assaults in the off-campus apartment were caused by the university's "failure to provide adequate supervision and guidance to player-hosts chosen to show the football recruits a 'good time'"; and that "the likelihood of such misconduct was so obvious" that the university's failure "was the result of

deliberate indifference." *Id.* at 1173. In short, the *Simpson* court made clear that a university can exercise substantial control over an off-campus context when it facilitates the presence of both the perpetrators and victims of sexual violence at the site, chooses to minimize its own oversight of their activities, and thus increases the risk of assault.

In *Feminist Majority Foundation v. Hurley*, 911 F.3d 674 (4th Cir. 2018), a student organization, Feminists United, had spoken out against a student senate vote to authorize male-only fraternities at University of Mary Washington ("UMW"). *Id.* at 680. UMW students debated the issue through anonymous posts on Yik Yak, a social media platform that allowed users to communicate with each other within a 1.5-mile radius, such that the "harassing and threatening messages originated on or within the immediate vicinity of the UMW campus." *Id.* at 680 n.1, 687. Between November 2014 and the summer of 2015, UMW students posted hundreds of harassing messages on the Yik Yak platform, many threatening "physical and sexual violence" against members of Feminists United. *Id.* at 680, 682, 684.

The Fourth Circuit held that UMW had substantial control over the context of the harassment conducted over Yik Yak, as "the harassing and threatening messages originated on *or within the immediate vicinity* of the UMW campus." *Id.* at 687 (emphasis added). Even though the offending posts on Yik Yak were anonymous, plaintiffs contended that UMW exercised control over the context of the harassment because it had some ability to identify the harassers. "If the University had pinpointed the harassers, it could then have circumscribed their use of UMW's network." *Id.* at 688. The court discussed the range of other remedial measures that the University had at its disposal: (1) "[T]he University could have disabled access to Yik Yak

campuswide"; (2) "UMW administrators could have more clearly communicated to the student body that the University would not tolerate sexually harassing behavior"; (3) "[t]he University also could have conducted mandatory assemblies to explain and discourage cyber bullying and sex discrimination"; and (4) the University "could have provided anti-sexual harassment training to the entire student body and faculty." *Id.* at 688. In other words, the *Feminist Majority* court held that a university has substantial control over an off-campus context when it has the ability to take actions that would likely prevent harassment in the immediate vicinity of the campus.

In *Weckhorst v. Kansas State University*, 241 F. Supp. 3d 1154 (D. Kan. 2017), *aff'd sub nom. Farmer v. Kansas State University*, 918 F.3d 1094 (10th Cir. 2019), the plaintiff was a female student at Kansas State University ("KSU"). *Id.* at 1159. She alleged in her complaint that she attended an off-campus fraternity event where she became intoxicated. *Id.* at 1159. J.F., a fellow student at KSU and a designated driver for his fraternity, took the plaintiff into his truck and raped her in front of about fifteen KSU students. *Id.* J.F. then drove her back to his off-campus fraternity house and assaulted her on the way. *Id.* When they arrived at the fraternity house, he raped her again, left her alone, naked and passed out, and another KSU student and member of the fraternity, J.G., raped her two more times. *Id.*

The University refused to discipline J.F. and J.G. on the ground that the rapes had taken place off campus. *Id.* at 1160. The plaintiff suffered from symptoms of post-traumatic stress disorder, stopped going to class, and ultimately lost her scholarship. *Id.* at 1163–64. She sued under Title IX, alleging deliberate indifference by KSU. *Id.* at 1164.

The district court held that the University had sufficient control over the off-campus contexts to warrant Title IX liability. *Id.* at 1168. In support, the court cited a number of factual allegations in the complaint: (1) KSU fraternities were open only to KSU students and are described on the University's website as "Kansas State University Organizations"; (2) the director of the fraternity at issue was a university instructor; (3) the University promoted its fraternities to prospective students and parents; (4) the University had five employees specifically charged with supporting and advising fraternities and sororities; (5) the University had the authority to regulate fraternities, including promulgating rules for parties; and (6) the Dean of Student Life approved the suspension of the fraternity for its use of alcohol at the party where the plaintiff was raped. *Id.* at 1167. In sum, the oversight of the relevant organization by a school staff member, regulatory authority by the school, and strong affiliation of the fraternity with the school were sufficient, when considered together, to establish control over the off-campus contexts where the plaintiff was raped.

In *Roe ex rel. Callahan v. Gustine Unified School District*, 678 F. Supp. 2d 1008 (E.D. Cal. 2009), the court held that a school had substantial control over the context where upper-class teammates sexually assaulted and harassed the plaintiff at an off-campus summer football camp. *Id.* at 1011, 1025. The court so held because (1) the camp was sponsored and promoted by the high school and the district's coaches; (2) the players were supervised at the camp by district employees; and (3) the camp was governed by a district Administrative Directive that outlined supervision ratios and disciplinary procedures. *Id.* at 1025. In determining that the school had substantial control over the off-campus context, the district court considered the

school's connection to the location where the harassment took place as well as the school's disciplinary authority over both the setting and the individuals involved.

In the case before us, the district court held as a matter of law that the University did not have substantial control over the context in which Bradford's September 12 and 13 assaults on Brown occurred because the assaults took place off campus.

Depending on the circumstances of the case, the location of harassment can be important in a student-on-student Title IX case. But location is only one factor in determining the control over context. Considering all the circumstances of this case and viewing the facts in the light most favorable to Brown, we hold that Brown presented sufficient evidence to allow a reasonable factfinder to conclude the University had "substantial control" over the "context" in which Bradford assaulted Brown on September 12 and 13.

There is undisputed evidence that the University had control over the off-campus housing in which Bradford was living while attending the University. After he finished his freshman year, Bradford moved into another off-campus house with other members of the football team. The University and football program allowed Bradford and his teammates to live off campus only with the permission of their coaches. Head coach Rodriguez testified in his deposition that under Player Rule 15, permission to live off campus was conditioned on good behavior and could be revoked. The very existence of this off-campus players' residence was therefore subject to the coaches' control. Even behavior as innocuous as being late to appointments or receiving bad grades could result in players' being forced to move back on campus.

The University's Student Code of Conduct applies to student conduct "both on-campus and off-campus" because off-campus misconduct can affect student health, safety, and security as much as on-campus misconduct can. The Code "seeks to hold students and organizations accountable for misconduct and to prevent it from happening again in the future." The University issued a no-contact order to Bradford on behalf of Student A that expressly applied both to on-campus and off-campus spaces. As the dissenters recognize, an element of "school sanction, sponsorship, or connection to a school function is required" for a school to control an off-campus context. Here, the University's rules and "sanction" authority created such a connection.

This discipline-related factor was critical in both *Roe* and *Weckhorst*. *See* 678 F. Supp. 2d at 1025; 241 F. Supp. 3d at 1167. In those cases, the schools imposed heightened supervisory control and specific rules over the football camp and university fraternities, respectively. *Id.* Also, in *Feminist Majority*, the Fourth Circuit identified all the disciplinary and remedial tools that UMW could have mobilized to mitigate or prevent the on- and off-campus harassment. 911 F.3d at 688.

In addition to the Code of Conduct applicable to all students, Bradford was subject to increased supervision through Player Rules specific to football players. *Cf. Roe*, 678 F. Supp. 2d at 1025; *Weckhorst,* 241 F. Supp. 3d at 1167. The Player Rules required all freshmen team members to live in university dormitories. Bradford flouted the rules during his freshman year. Even though Bradford had an assigned dormitory room, DeGroote testified that he stayed at her off-campus house "most nights" from January to "around" April 2016, when she "kicked him out." When Bradford was no longer allowed to live in the same

dormitory as Student A in mid-April because of the no-contact order, Bradford moved off campus entirely, into a house shared with another football player. Had university officials or football staff members chosen to investigate, they could have enforced the Player Rules, requiring Bradford to live in university dormitories during the entirety of his freshman year. This heightened level of control and disciplinary power strengthened the connection between Bradford's off-campus housing and the University's football program.

Rodriguez testified that the football team had a zero-tolerance policy for violence against women. He testified that a player's violence against women would lead to immediate dismissal from the team. Rodriguez testified that the "first time" he heard about Bradford "doing anything physically violent to his girlfriend" was the day he kicked him off the team. Rodriguez said that if he had known earlier, he "certainly" "would have kicked him off earlier." According to Rodriguez's undisputed testimony, had he been informed of Bradford's assaults on Student A and DeGroote during Bradford's freshman year, Bradford would have been kicked off the team, and accordingly would have lost his football scholarship. Even if he had engaged in lesser misconduct, he would never have been permitted to live off campus while a member of the team. As in *Simpson*, the University failed to impose its supervisory power and disciplinary authority over an off-campus context, despite having notice of the high risk of misconduct. *See* 500 F.3d at 1173. A reasonable factfinder could infer from Rodriguez's testimony that, had Rodriguez known of Bradford's assaults on Student A and DeGroote, Bradford's September 12 and 13 assaults on Brown at his off-campus house would never have occurred.

Brown submitted an expert report to the district court. Among other things, the expert wrote that the University had control over where Bradford lived. "Student-athletes, especially those at large Division I 'Power 5' conference schools, . . . are told where they can live, where and when they will be places—including practices, games, housing, meals, and study time. They are given clear expectations for behavior when not in school or at practice[.]"

Viewing this evidence in the light most favorable to Brown, a reasonable factfinder could conclude that the University had "substantial control" over the "context" in which Bradford violently assaulted Brown on September 12 and 13.

B. "Actual Knowledge" and "Deliberate Indifference"

The district court addressed only the requirement that Brown show that the University had substantial control over the "context" in which her abuse occurred. It did not address either the "actual knowledge" or "deliberate indifference" requirements to establish a Title IX claim based on student-on-student sexual harassment. We could remand to allow the district court to address these two requirements in the first instance. However, in the interest of judicial efficiency, we address them now. *See Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1136 (9th Cir. 2003); *Dole Food Co. v. Watts*, 303 F.3d 1104, 1117–18 (9th Cir. 2002) ("Because the record is sufficiently developed and the issue has been presented and argued to us, we agree that it is appropriate for us to decide the question.").

1. "Actual Knowledge"

The Supreme Court held in *Gebser* that a damages remedy under Title IX is not available "unless an official

who at a minimum has authority to address the alleged discrimination and to institute corrective measures . . . has *actual knowledge* of discrimination . . . and fails adequately to respond."  524 U.S. at 290 (emphasis added).  Neither *respondeat superior* nor constructive knowledge is sufficient.  *Id.* at 285; *see also Davis*, 526 U.S. at 642.

We agree with the Fourth Circuit that "actual knowledge," as used by the Court in *Gebser*, means either actual knowledge or actual notice.  *See Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 266–68 (4th Cir. 2021).  The Court in *Gebser* wrote that an official must be "*advised* of a Title IX violation."  524 U.S. at 290 (emphasis added).  The Fourth Circuit construed this passage to mean that "a school has actual notice or knowledge when it is informed or notified of the alleged harassment—most likely via a report."  *Doe*, 1 F.4th at 266.  Further, the Court in *Gebser* denied liability on the ground that the information reaching the principal of the school was "plainly insufficient *to alert the principal to the possibility* that [the teacher] was involved in a sexual relationship with [the student plaintiff]."  524 U.S. at 291 (emphasis added).  In *Davis*, decided a year after *Gebser*, the Court indicated that its definition of "knowledge" included "notice," holding that the plaintiff could establish liability by showing that the school board had failed to respond to "five months [of] *complaints* of [the alleged harasser's] in-school misconduct."  526 U.S. at 649 (emphasis added); *see also Doe v. Galster*, 768 F.3d 611, 614 (7th Cir. 2014) ("To have actual knowledge of an incident, school officials must have witnessed it *or received a report of it.*" (emphasis added)).

In its brief to us, the University seeks to minimize the knowledge of, or notice given to, responsible university officials.  The University writes, "[Brown] has pointed to no authority or evidence that allows such a leap—that *notice*

*about a single incident where Student A was not harmed* was notice that all women were substantially at risk of Bradford's violence or harassment." (Emphasis added). The University substantially understates the matter. Responsible university officials had actual knowledge and notice of far more than "a single incident" in which Student A "was not harmed."

As recounted above, in the fall of 2015, an RA investigated and reported a physical fight between Bradford and Student A, but university administrators declined to inform the police or take further action. Once Student A's softball coach learned from her parents about Braford's abuse in early 2016, the coach called Erika Barnes, the Senior Associate Athletics Director, Senior Woman Administrator, and Deputy Title IX Coordinator for Athletics. Barnes learned about the parents' concerns with the relationship, and accordingly sent Student A to meet with a school psychologist.

On March 23, 2016, two of Student A's softball teammates told Barnes that Student A was Bradford's girlfriend; that Student A had told them that in the fall Bradford had pushed her up against a wall and had choked her; and that Student A currently had a black eye and fingermarks on her neck. They told Barnes that Bradford had also assaulted another girlfriend, DeGroote; that Bradford often hit DeGroote and that she often had bruises and marks all over her body; that Bradford had sent to unspecified persons a video of DeGroote having sex with him; and that Bradford had kicked and thrown DeGroote's dog into another room. The teammates also told Barnes that Bradford's university roommate and best friend from high school had warned them that Bradford "had a violent past"; that Bradford was not afraid "to hurt someone"; and that "[people] need to be careful."

On March 24, Barnes and Susan Wilson, Senior Title IX Investigator, interviewed Student A.  During the interview, Student A told Barnes and Wilson that Bradford had choked her.  She also told them that Bradford might be living with another student, "Lida."

Wilson then informed the Associate Dean of Students, Chrissy Lieberman, that she had heard thirdhand "that there was potential that Lida was in a concerning relationship." Wilson asked Lieberman to check in with Lida about the relationship.  Lieberman never did so.

On April 10, Barnes and a university police officer interviewed Student A.  Student A told Barnes and the police officer that Bradford had choked her on three occasions to the point where she could not breathe.  She also told the police officer that she wanted a protective order against Bradford.  Wilson then issued one.

Later on April 10, after Bradford had banged on Student A's dormitory room door the previous night, Barnes called Byrne, the University's Athletic Director, to report the door-banging incident.  Barnes told Byrne that Bradford had been intoxicated and that he had banged on Student A's door for nearly two hours.  In response to Barnes's call, Byrne notified Bradford's position coach on the football team. Rodriguez, the head coach of the football team, was out of town but was notified later.  As a result of Barnes's report to Byrne, Bradford was subjected to "a lecture on underage drinking" and three days of "physical punishment."  While Barnes's report to Byrne was radically incomplete (as we discuss in the next section), this chain of events shows that Barnes had the "authority to address" Bradford's behavior and "to institute corrective measures." *See Gebser*, 524 U.S. at 290.

We therefore hold that evidence in the record would support a conclusion by a reasonable factfinder that University officials had actual knowledge or notice of Bradford's violent assaults, and that Barnes was "an official who . . . ha[d] authority to address [Bradford's violent assaults on Student A and DeGroote] and to institute corrective measures." *Id.*

## 2. "Deliberate Indifference"

The Supreme Court held in *Davis* that an educational institution is liable under Title IX only if it is "deliberately indifferent" to student-on-student harassment. 526 U.S. at 646–47. The Court wrote that an educational institution covered by Title IX can be "deemed 'deliberately indifferent' to acts of student-on-student harassment only where the [institution's] response to the harassment . . . is clearly unreasonable in light of the known circumstances." *Id.* at 648.

"Clearly unreasonable" responses take many forms. *See, e.g.*, *Doe v. Sch. Dist. No. 1, Denver, Colo.*, 970 F.3d 1300, 1304 (10th Cir. 2020) (holding that a school administration's failure to investigate numerous complaints of harassment and taking "little if any[]" action to prevent the harassment was unreasonable). Several decisions by our sister circuits are particularly on point.

In *Simpson*, the Tenth Circuit case involving CU football recruits, the University had failed to address numerous instances of sexual assault and harassment in the years prior to the rapes at issue. 500 F.3d at 1181–83. The University had known that two recruits had assaulted a high-school girl at an off-campus hotel party hosted by a CU football player in 1997. *Id.* at 1181. After a meeting with the District Attorney's office "to work to prevent these . . . kinds of

events from occurring," "none of the eventual recruiting or policy changes—the most substantive of which was apparently a ban on alcohol or tobacco for recruits— addressed either sexual contact between recruits and females or the responsibilities of player-hosts." *Id.* at 1182. The abusive culture persisted. The father of a female player on the predominantly male team reported to the head coach and the athletic director "about multiple instances of sexual harassment of [his] daughter by CU football players, which the coaching staff had allowed to continue." *Id.* at 1183. When the player made additional complaints, the head coach and the athletic director "retaliated against her by preventing her from staying on the football team and interfered with her playing elsewhere." *Id.* Then, in September 2001, a football player raped a female student employed by the athletic department, and the head coach discouraged her from pressing charges. *Id.*

The Tenth Circuit observed that in light of the university's knowledge of the foregoing, the "central question" was whether there was an "obvious" risk that a future Title IX violation would occur. *Id.* at 1180–81. The court held that the evidence before the district court could support finding that (1) the head coach "had general knowledge of the serious risk of sexual harassment and assault during college-football recruiting efforts; (2) [he] knew that such assaults had indeed occurred during . . . recruiting visits; (3) [he] nevertheless maintained an unsupervised player-host program to show high-school recruits a 'good time'; and (4) [he] knew, both because of incidents reported to him and because of his own unsupportive attitude, that there had been no change in atmosphere" since the earlier assault. The court held that "[a] jury could infer that 'the need for more or different

training of player-hosts was so obvious, and the inadequacy so likely to result in Title IX violations, that the head coach could reasonably be said to have been deliberately indifferent to the need.'" *Id.* at 1184–85 (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)) (cleaned up).

In *Vance v. Spencer County Public School District*, 231 F.3d 253 (6th Cir. 2000), the Sixth Circuit found that a school was deliberately indifferent to ongoing physical and sexual harassment. *Id.* at 262. The principal was informed that the plaintiff experienced harassment, and the plaintiff's mother filed a detailed complaint with the Title IX coordinator. *Id.* at 262–63. The school did not investigate or discipline anyone. *Id.* at 262. School officials merely "talked" to the students harassing the plaintiff, which only increased the harassment. *Id.*

In *Williams v. Board of Regents of University System of Georgia*, 477 F.3d 1282 (11th Cir. 2007), the Eleventh Circuit held that the plaintiff adequately alleged deliberate indifference by the University of Georgia to state a Title IX claim. *Id.* at 1296–97. A basketball player, Tony Cole, had invited the plaintiff over to his dormitory. *Id.* at 1288. After they engaged in consensual sex, Cole encouraged his teammate and two football players to sexually assault the plaintiff. *Id.* The head coach, athletic director, and university president knew that Cole had previously been expelled from another school for sexually assaulting two women and had been dismissed from a team at another school for disciplinary problems, including sexually harassing a woman. *Id.* at 1289–90. Despite this knowledge, they still recruited and admitted Cole through a special admissions process, providing him a full scholarship. *Id.* at 1290. The school also "failed to inform student-athletes about the applicable sexual harassment policy," *id.* at 1297,

after "UGA officials received suggestions from student-athletes that coaches needed to inform the student-athletes about" it, *id.* at 1290.

In *Hall v. Millersville University*, 22 F.4th 397 (3d Cir. 2022), parents sued Millersville University under Title IX after their daughter was murdered in her dorm room by her non-student boyfriend. *Id.* at 399. Four months before the murder, in October 2014, a resident assistant had provided an incident report to the university's Deputy Title IX Coordinator and its Area Coordinator after she heard and then intervened in a fight between the victim and her boyfriend. *See id.* at 400–01. The Title IX officials never sent the report to the university's Title IX Coordinator, as required by university policy. *Id.* at 401–02. The university also did not reach out to the victim after the October incident. *Id.* at 411. Nor did it respond after her roommate's mother called the school to report that the victim had been assaulted and had a black eye. *Id*. at 401. The court held that these facts established that a reasonable juror could find that the university was deliberately indifferent. *Id.* at 411.

As noted above, Barnes chose to report to Athletic Director Byrne only that Bradford had yelled and banged on Student A's dormitory room door for almost two hours. That Bradford had done this was already public knowledge. Barnes chose not to report to Byrne Bradford's actions that were not public knowledge. She chose not to report Bradford's repeated violent assaults on Student A and DeGroote; not to report that Bradford had threatened to send compromising pictures to Student A's family members if she reported his violence; not to report that Bradford had sent to unspecified persons a video of DeGroote having sex with him; and not to report that Bradford's university roommate

and best friend from high school had warned Student A's teammates that Bradford was a violent person.

Other officials had information about Bradford's violence towards Student A and DeGroote and chose not to report or investigate. In fall 2015, the University Community Director instructed an RA not to call the police after he learned of a physical fight between Bradford and Student A. Additionally, as discussed above, Senior Title IX Investigator Susan Wilson requested that Associate Dean of Students Chrissy Lieberman follow up about DeGroote's potentially concerning relationship. Lieberman met with DeGroote but did not check in about the relationship.

As in *Hall*, Title IX officials failed to report critical facts about Bradford's actions. *See* 22 F.4th at 401–02. Further, as in *Simpson*, the University had knowledge of prior harassment and assaults, such that there was an "obvious" risk that without intervention, a future Title IX violation would occur. 500 F.3d at 1180–81.

Given Barnes's report to Athletic Director Byrne, a reasonable factfinder could conclude that Barnes's responsibilities included reporting to Byrne, or to other responsible parties in the Athletic Department, student-on-student harassment by university athletes. A reasonable factfinder also could conclude that Barnes's reporting only Bradford's yelling and banging on Student A's dormitory room door while failing to report his much more serious behavior was "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648. That is, a reasonable factfinder could conclude that Barnes's response amounted to "deliberate indifference." *Id.*

Conclusion

We hold that a reasonable factfinder, viewing the evidence in the light most favorable to Brown and drawing all justifiable inferences in her favor, could conclude that the University had "substantial control" over the "context" in which Bradford violently assaulted Brown; that Barnes, an official with "authority to address" student-on-student harassment and "to institute corrective measures," had "actual knowledge" of Bradford's violence against Student A and DeGroote; and that Barnes's response was "clearly unreasonable in light of the known circumstances," demonstrating the University's "deliberate indifference" to the danger Bradford posed to other female students at the University.

We reverse and remand for further proceedings consistent with this opinion.

**REVERSED and REMANDED.**

_____

FRIEDLAND, Circuit Judge, concurring:

I concur in Judge Fletcher's thoughtful opinion in its entirety. I write separately to address the waiver argument raised by Judge Nelson and Judge Rawlinson in their respective dissents.

In proceedings before the three-judge panel, Brown did, in my view, disavow the argument that the University exercised control over Bradford's off-campus apartment. But a majority of the three-judge panel addressed that theory on its merits anyway, devoting more than twice as much space to it than to the argument that Brown herself advanced. *Brown v. Arizona*, 23 F.4th 1173, 1181-83 (9th Cir. 2022).

Had the three-judge panel merely disposed of the control-over-off-campus-apartment theory on waiver or forfeiture grounds—which it could have done in an unpublished memorandum disposition—there likely would not have been a rehearing en banc.  And if there still had been a rehearing en banc, I likely would have thought it inappropriate for the en banc panel to resolve this case based on a theory that Brown herself disclaimed.  When we publish opinions addressing arguments on their merits, however, it is crucial that we get the law right―and I agree with Judge Fletcher that the majority opinion for the three-judge panel got the law wrong.

The University's control over the context of Bradford's abuse of Brown was the basis for the en banc call in this case.  After a majority of the active judges on our court voted to rehear this case en banc, Brown sought to file a supplemental brief addressing that issue, noting that the vacated opinion "reached an issue of significant public importance that was not the subject of adversarial party briefing."  The en banc panel granted Brown's motion, and both parties filed supplemental briefs addressing the University's control over the context in which Bradford abused Brown.  When an opinion by a three-judge panel resolves a legal claim and "the case is called en banc on grounds that would correct the opinion but which were not raised before the original panel, the en banc panel [is] certainly . . . permitted, if not encouraged, to decide the case on the correct, unraised grounds."  *Socop-Gonzalez v. I.N.S.*, 272 F.3d 1176, 1186 n.8 (9th Cir. 2001) (en banc), *overruled on other grounds by Smith v. Davis*, 953 F.3d 582, 599 (9th Cir. 2020) (en banc); *see also United States v. Hernandez-Estrada*, 749 F.3d 1154, 1159-60 (9th Cir. 2014) (en banc) (addressing an issue raised

in a concurrence by a member of a three-judge panel and further developed in en banc briefing).

Because Brown has now "unquestionably raised" her argument that the University exercised substantial control over the context in which she was abused, I believe it is proper for the en banc panel to address that issue. *Socop-Gonzalez*, 272 F.3d at 1186 n.8. On remand, however, the University should be permitted to reopen discovery, if there is discovery that the University would have conducted had Brown advanced this theory from the outset.

---

RAWLINSON, Circuit Judge, with whom LEE, Circuit Judge, joins, dissenting:

I will be the first to say that what happened to Ms. Brown at the hands of serial offender Orlando Bradford, a football player at the University of Arizona, was a horrific experience that no one should have to endure. But the question before us is not whether we abhor the abominable conduct to which Ms. Brown was subjected. The question before us is whether Ms. Brown can recover damages from the University of Arizona under Title IX. Because the circumstances of this case do not fall within the parameters of Title IX as enacted and as interpreted by the United States Supreme Court, I respectfully dissent.

As context is a pivotal part of this case, it might be helpful to recall the context surrounding the enactment of Title IX. Title IX initially emerged as a mechanism for ensuring that female athletes were provided equal opportunity for participating in athletic programs and other activities conducted under the auspices of educational institutions receiving federal funds. *See* 20 U.S.C.A.

§ 1681(a) ("No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination *under any education program or activity receiving Federal assistance . . .*") (emphasis added); *see also Breaking Down Barriers*, *A Legal Guide To Title IX and Athletic Opportunities*, National Women's Law Center (2007), p.3 ("Title IX of the Education Amendments of 1972 is the primary federal law barring sex discrimination in all facets of education, including sports programs. Title IX requires that members of both sexes have equal opportunities to participate in sports and receive the benefits of competitive athletics. It also requires that athletic scholarships be allocated equitably and that men and women be treated fairly in all aspects of sports programming.")

This emphasis on a tether to the *programs and activities of educational institutions* to support a Title IX claim is echoed in the seminal Supreme Court cases addressing Title IX. In *Gebser v. Lago Vista Independent School District*, 524 U.S. 274, 285 (1998), the Supreme Court "conclude[d] that it would frustrate the purposes of Title IX to permit a damages recovery . . . based on principles of *respondeat superior* or constructive notice." Stated differently, without a tether to a program or activity of an educational institution, no remedy is available under Title IX. *See id.*

This theme was reiterated and refined in *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999), involving a "prolonged pattern of sexual harassment" against a fifth-grade student who was victimized by one of her classmates. *Id.* at 633. In its analysis, the Supreme Court reiterated its holding in *Gebser* that "a recipient of federal funds may be liable in damages under Title IX only for its own misconduct." *Id.* at 640. The Supreme Court emphasized

that the "recipient itself" must engage in the acts prohibited by Title IX and that those acts must be "*under [the recipient's] programs or activities*." *Id.* at 640-41 (emphasis added) (cleaned up).

The Supreme Court refined the analysis applicable to Title IX claims by explicating how to determine whether the prohibited acts occurred "under [the recipient's] programs or activities." *Id.*  The Supreme Court clarified that Title IX's "plain language confines the scope of prohibited conduct based on the recipient's degree of control over the harasser *and* [over] the environment in which the harassment occurs." *Id.* at 644 (emphasis added).  The Supreme Court explained further that for the harassment to occur "under the operations of a funding recipient, the harassment must take place in a context subject to the school district's control." *Id.* at 645 (citations and internal quotation marks omitted).  The Supreme Court encapsulated its holding by limiting "a recipient's damages liability to circumstances wherein the recipient exercises substantial control over both the harasser *and* the context in which the known harassment occurs." *Id.* (emphasis added).

Applying this holding to the facts before it, the Supreme Court noted that the sexual harassment "occurr[ed] during school hours and on school grounds," quintessentially "under an operation of the funding recipient." *Id.* at 646 (citation and internal quotation marks omitted).  The Supreme Court considered these specific circumstances, with the school "retain[ing] substantial control over the context in which the harassment occurr[ed] . . . during school hours and on school grounds" *and* "exercis[ing] significant control over the harasser." *Id.*  The *Davis* case reinforced the requirement of a tether to the programs and

activities of an educational institution to impose liability for damages under Title IX. *See id.*

With this framework firmly in mind, I proceed to the facts and issues presented in this appeal which do not fit within the straightforward analysis articulated in *Davis*.

## I. Background

There is no real dispute about the underlying facts of this case in terms of the inexcusable physical abuse heaped upon Ms. Brown and other female students at the University of Arizona. The majority recites the facts in painstaking detail, *see Majority Opinion*, pp. 8-20, but these recited facts establish only that the University had control over the harasser. Glaringly absent from the majority's recitation of the facts is any factual underpinning establishing both control elements set forth in *Davis*: "significant control over the harasser" *and* "substantial control over the context in which the harassment occurr[ed]." *Davis,* 562 U.S. at 646. Lacking that underpinning, the majority has not and cannot identify a program or activity of the University of Arizona that was involved in the alleged Title IX infraction.

It is undisputed that the physical abuse inflicted upon Ms. Brown occurred in Bradford's off-campus house. There is no indication in the record that the house is affiliated with the University of Arizona in any respect. The University did not lease the house for Bradford and did not pay the owner of the house for Bradford to live there. Coach Rodriguez, the then-head football coach testified in his deposition that under the rules governing football players "[l]iving off-campus is subject to approval by [the] head coach and position coach. Off-campus subject to moving back on campus." When asked to explain what the rule meant, Coach Rodriguez clarified that in the second year of college players

could move off-campus "as long as they were doing okay academically and, you know, not being irresponsible as far as making their appointments and practices and meetings and everything else on time, they could move off-campus." Coach Rodriguez continued that if a player moved off-campus and "were late to class all the time or missing or being late for different things or missing appointments, . . . we could move them back on campus." However, Coach Rodriguez could not recall a single instance "where a student was living off-campus and [the coach] moved him back on campus."[1]

## II. Discussion

### A. Control Over The Harasser (Bradford)

As a student athlete, Bradford was subject to discipline from the University of Arizona as a student and from the football coaches as a football player. There were specific rules governing the conduct of football players. Indeed, Coach Rodriguez testified in his deposition that he had a zero tolerance policy for domestic violence, and that he dismissed Bradford from the team as soon as he learned about his physical abuse of Ms. Brown.

As discussed, Bradford could only move off-campus with permission from his coaches. And he could be required to move back on campus if he were not "doing okay academically" and "not being responsible as far as making

---

[1] The Majority Opinion characterizes Coach Rodriguez's testimony as conditioning permission to live off-campus on "good behavior." *Majority Opinion*, p. 32. However, Coach Rodriguez never mentioned "good behavior" in his testimony. He only discussed acting responsibly in terms of academics and being on time for practices, meetings, and appointments.

[his] appointments and practices and meetings and everything else on time."

From these facts, I readily agree that the University of Arizona "exercise[d] significant control over the harasser." *Davis*, 526 U.S. at 646.

## B. Control Over The Context In Which The Harassment Occurred

On this issue, I fundamentally disagree with the majority's analysis and conclusion. I start from the premise set forth in *Davis* that for damages liability to be available under Title IX, the harassment must be tethered to the programs and activities of the educational institution, in this case the University of Arizona. *See id.* at 640-41. To determine whether the harassment is sufficiently tethered to the programs and activities of an educational institution, not only must the institution "exercise significant control over the harasser," *id.* at 646, but also "retain *substantial* control over the context in which the harassment occurred." *Id.* (emphasis added). These are two separate inquiries. As discussed, the record definitively supports the conclusion that the University of Arizona "exercise[d] significant control over" Bradford, the harasser. *Id.* However, the same is not true for the separate inquiry of whether the University "*retain[ed] substantial control over the context in which the harassment occurred*," *id.*, (emphasis added), an off-campus house that was not connected to the University in any way.

As acknowledged by the majority, before the district court and the three-judge panel Ms. Brown never argued that the University of Arizona "retained substantial control" over the off-campus house. *Id.* Rather, she predicated the University's liability on allowing Bradford to remain a student and football player at the University after receiving

reports that Bradford had been physically abusive to other female students at the University. *Majority Opinion,* p. 22. Ms. Brown, in fact, expressly disclaimed any argument based on the University's control over the context in which the harassment occurred. Rather, she argued that "[t] he question is whether the University *had sufficient control over the context in which [Brown] alleges that [the University] failed to act*, not whether [the University] had sufficient control over the context in which she was later attacked." (emphasis in the original). In contrast, at oral argument before the en banc panel, counsel for Ms. Brown took the cue from the dissenting opinion of the three-judge panel to advance the theory that the University had control over the context in which Ms. Brown's harassment occurred, a theory that is embodied in the en banc majority opinion.

To support its conclusion that the University "retain[ed] *substantial control* over the [off-campus] context in which the harassment occurred," *Davis*, 526 U.S. at 646 (emphasis added), the majority references the following facts:

> 1. Bradford was subject to Player Rules specific to football players, including a rule requiring players to obtain permission before moving off-campus.
>
> 2. Bradford was subject to the University's Student Code of Conduct that applied to all students and organizations, seeking to hold them "accountable for misconduct and to prevent it from happening again in the future."

3.     Coach Rodriguez expressed a zero-tolerance policy for violence against women.

*Majority Opinion,* pp. 32-34.

The majority professes that "[this] heightened level of control and disciplinary power strengthened the connection between Bradford's off-campus housing and the University's football program." *Id.*, p. 34. Not so. The described "heightened level of control and disciplinary power" applied only to Bradford and not to the off-campus house.

More specifically, the problem with reliance on these facts is that they are all indicia of control over Bradford, the harasser, rather than indicia of control over the off-campus context in which the assault occurred. This failing is highlighted by the majority's discussion of the expert report concluding that "the University had control over where Bradford lived." *Id.,* p. 35. But control over whether Bradford, the harasser, could live off-campus does not equate to control over the off-campus context in which the harassment occurred, the separate inquiry required under *Davis*.

The majority asserts that "[t]here is undisputed evidence that the University had control over the off-campus housing in which Bradford was living while attending the University." *Id.*, p. 32. Nothing could be further from the truth. In fact, there is absolutely *no* evidence in the record that the University had control over the off-campus house where the assault occurred. There is no evidence in the record that the house was designated student housing. There is no evidence in the record that the owner of the house had

a contract with the University to house students. There is no evidence in the record that anyone from the University directed Bradford to live in that particular house. There is no evidence in the record that the University leased the house for Bradford. There is no evidence in the record that the University paid for Bradford to live in the house. There is no evidence in the record that the University in any way supervised or endorsed the activities in the house.

Adoption of the majority's approach would sever the pivotal tether to programs and activities of the educational institution that is at the core of Title IX. *See* 20 U.S.C.A. § 1681(a) (prohibiting "discrimination *under any education program or activity*") (emphasis added). Under the majority's view, so long as the educational institution had control over the harasser, the institution's liability would automatically follow, regardless of whether a "program or activity" of the institution was involved. With permission from the author, I paraphrase the two examples discussed in the panel opinion because they vividly demonstrate the overreach of the majority's conclusion:

> Example Number One: A fellow student and football player at the University of Arizona lives at home with his parents while attending the University and playing on the football team. That player would be subject to the same University Student Code of Conduct and Player Rules referenced by the majority. Under the majority's analysis, the University would be deemed to have control over the parent's residence, and an assault occurring in that home would be considered committed

"under an[] education program or activity" of the University.

Example Number Two: A fifth-grader (same age as the harasser in *Davis*) is subject to a student code of conduct that prohibits harassment of other students. At a birthday party at her home over the weekend, the student engages in behavior that violates the code of conduct, and subjects her to discipline by the school. Under the majority's analysis, because of its ability to discipline the student for violation of the code of conduct, the school controlled the context of the birthday party held at the student's home.[2]

The majority's collapsing of the two prongs is exposed in its articulation that "a key consideration is whether the school has some form of disciplinary authority over the harasser in the setting in which the harassment takes place." *Majority Opinion,* p.26. But this analysis is a sharp and troubling departure from the two-pronged analysis articulated in *Davis*, and the cases cited by the majority do not support this overreach. Actually, a discussion of the facts of those cases serves to distinguish them.

The case with the most analogous facts is *Simpson v. University of Colorado Boulder*, 500 F.3d 1170 (10th Cir. 2007). In that case, two female University students were sexually assaulted in one of the female student's off-campus

---

[2] Tellingly, the majority offers no response to these clear demonstrations of the effects of collapsing the two prongs articulated in *Davis* to focus solely on control over the harasser.

apartment. *See id.* at 1172-73. The female students were assaulted by members of the University's football team and by high school students being recruited to play football at the University. *See id.* at 1173. The record reflected that the University "paired each visiting recruit with an 'Ambassador,' usually female, who escorted the recruit around campus throughout the visit." *Id.* at 1180. The University also matched the high school recruits with University football players "selected by the coaching staff, including the head coach." *Id.* According to an attorney in the University's counsel office, who later became associate athletic director, "the player-hosts, who were usually underclassmen, were chosen because they knew how to party and how to show recruits a good time and would do a good job of entertaining them." *Id.* (citation, alteration, and internal quotation marks omitted). As alleged by the plaintiffs, and confirmed by the University's counsel, these recruiting activities were "officially sanctioned" by the University. *Id.* at 1175. Under these facts, a conclusion that the University had substantial control over the context of the off-campus sexual assault is completely consistent with *Davis* and vastly at odds with the facts of our case, when the only involvement of the University of Arizona was permitting Bradford to live off-campus.

The majority represents that *Simpson* "made clear that a university can exercise substantial control over an off-campus context when it facilitates the presence of both the perpetrators and victims of sexual violence at the site, chooses to minimize its own oversight of their activities, and thus increases the risk of assault." *Majority Opinion*, p. 29. However, as with most other broad statements, the devil is in the details. The court in *Simpson* found liability under Title IX only after first observing that the sexual assault took

place within the context of a program or activity of the University. *See Simpson*, 500 F.3d at 1175 (observing that the recruiting visits during which the sexual assaults occurred were "officially sanctioned" by the University.) "The assault[] arose out of an official school program," the recruiting of high school football students. *Id.* at 1174. This conclusion provided the required tether to a program or activity of the University. In contrast, this record contains absolutely no evidence that Brown was assaulted during any "officially sanctioned" event or that "[t]he assault[] arose out of an official [University of Arizona] program. *Id.* at 1174-75. In sum, the holding in *Simpson* is premised on facts that simply do not exist in this case.

Similarly, in *Feminist Majority Foundation v. Hurley*, 911 F.3d 674 (4th Cir. 2018), there was a clear tether to university involvement and on-campus activities. In this case, Feminists United, a student organization at the University of Mary Washington, and several of its members objected to a vote by the student senate "to authorize male-only fraternities *at [the University]*." *Id.* at 680 (emphasis added). Plaintiff Paige McKinsey was especially disturbed by the prospect that approval of male fraternities on-campus would "increase[] the number of on-campus sexual assaults." *Id.*

Soon after the on-campus town hall meeting, University students began debating the issue on Yik Yak, a social media application that allowed users within a limited geographic range to create and view messages posted anonymously. *See id.* The application was available to students on the University campus and several students posted strong and offensive "criticism of Feminist United and its members for their opposition to on-campus fraternities." *Id.* (footnote reference omitted).

Later in the month that the town hall meeting occurred, several members of Feminists United met with the University's Title IX coordinator to address "their concerns about the University's past failures in responding to student sexual assault complaints." *Id.* As the Feminists United members walked home from their meeting with the Title IX coordinator, other students drove by, screaming "F___ the feminists!" *Id.* (citation omitted).

Two days after the meeting with the Title IX coordinator, the University's men's rugby team was videotaped performing a graphic and highly offensive chant "that glorified violence against women, including rape and necrophilia." *Id.* & n.2.

After concluding that the University was not responding "to the rugby team's chant and other discriminatory acts suffered by female students *on campus*," Ms. McKinsey "published an opinion piece in [the University's] student newspaper. *Id.* at 681 (emphasis added). The opinion piece discussed the rugby team's chant and "recent harassing and threatening" postings on Yik Yak "aimed at Feminists United members." *Id.* There was an immediate backlash to the article, leading "to an escalation of verbal assaults and cyber-attacks on members of Feminists United." *Id.* (citation omitted). These attacks included "various comments of a derogatory, sexist and threatening nature . . . posted to the [University] newspaper's website." *Id.* (citation and internal quotation marks omitted).

Less than a month after Ms. McKinsey's opinion piece was published, members of the University's rugby team accosted Ms. McKinsey in the University's dining hall. *See id.* That same day, Ms. McKinsey informed the University's

Title IX coordinator that she "felt unsafe on the [University's] campus." *Id.*

The Fourth Circuit discussed the Yik Yak postings in some detail. On March 19, 2015, following expressions of outrage on Facebook in response to the rugby team's chant, the President of the University suspended all rugby activities indefinitely and required all rugby players "to participate in anti-sexual assault and violence training." *Id.* at 682. The President's decision unleashed a torrent of graphic abuse on Yik Yak "directed at members of Feminists United, blaming them for the rugby team's suspension." *Id.* The messages named Ms. McKinsey and two other members of Feminists United specifically, and threatened physical violence, sexual violence and death. *See id.*

Approximately one week after the rugby team's suspension, Ms. McKinsey was scheduled to speak at a meeting of the University's Young Democrats Club. After an anonymous Yik Yak user shared Ms. McKinsey's scheduled appearance "and outlined a plan to accost her" at the meeting of the Young Democrats Club, Ms. McKinsey contacted the University's police and reported "that she felt unsafe attending the Young Democrats meeting." *Id.* The campus police considered the threat serious enough to assign an officer to the meeting. *See id.*

The day after the meeting of the Young Democrats Club, Plaintiff Julia Michels, also a member of Feminists United, sent an email to the University President, the University Vice-President, and the University Title IX Coordinator. *See id.* The email described "nearly 200 examples of students using Yik Yak to post either vitriolic hate or threats" against the plaintiffs. *Id.* (citation omitted). The email reiterated

that the plaintiffs "feared for their safety on the [University] campus." *Id.* (citation omitted).

The day following Ms. Michels' email, members of Feminists United met with University administrators and requested that the University:  1) have the Yik Yak application disabled on campus; 2) bar access to Yik Yak on the University's wireless network; 3) be more transparent in communicating with students; 4) announce to the student body that Feminists United was not responsible for the suspension of rugby activities; and 5) hold an assembly to discuss "rape culture, harassment, [and] cyber bullying." *Id.* at 682-83 (cleaned up).  One Feminists United member emailed the University President that she felt "so unsafe at [the University] that she could not concentrate on her classwork." *Id.* at 683.

After a lack of action from the University administration, the plaintiffs filed a Title IX complaint with the Department of Education Office of Civil Rights, which they later withdrew to file an action in federal district court. *See id.* at 683-84.  The district court dismissed the plaintiffs' complaint on the basis that the University "had little — if any — control over the context in which the Feminists United members were harassed, because nearly all of that harassment occurred through Yik Yak." *Id*. at 687.

On appeal, the Fourth Circuit disagreed with the district court's conclusion, stating from the outset that the University "had substantial control over the context of the harassment because it actually transpired on campus." *Id.* The Fourth Circuit noted that "due to Yik Yak's location-based feature, the harassing and threatening messages originated on or within the immediate vicinity of the [University] campus." *Id.*  The Fourth Circuit also observed

that some of the offending messages "were posted using the University's wireless network, and the harassers necessarily created those [messages] on campus." *Id.* Most importantly, the Fourth Circuit concluded that "the harassment concerned events occurring on campus and specifically targeted [University] students." *Id., quoting Davis*, 526 U.S. at 646 ("Where the misconduct occurs during school hours and on school grounds, the educational institution retains substantial control over the context in which the harassment occurs.") (alterations omitted).

The events occurring on campus that prompted and epitomized the harassment included: 1) the student vote to authorize male-only fraternities; 2) the on-campus town hall meeting at which Feminists United members "questioned the wisdom of having such fraternities at [the University]"; 3) the vulgar chant performed by the University's rugby team; 4) members of the rugby team accosting Ms. McKinsey in the dining hall; and 5) the posting of derogatory comments to the University's newspaper. *See Feminist Majority*, 911 F.3d at 680-81.

In sum, the fact that pivotal events occurred on campus and that programs and activities of the University were at the heart of the harassment completely distinguishes *Feminist Majority* from the case before us. The rationale of the Fourth Circuit does not support the majority's conclusion that the University of Arizona had significant control over the off-campus harassment of Ms. Brown.

The majority recasts the holding of *Feminist Majority* by ignoring all of the harassment that took place on the university campus and the demonstrated control the university had over the off-campus conduct. Rather, the majority rephrases the *Feminist Majority* holding by

declaring: "In other words, the *Feminist Majority* court held that a university has substantial control over an off-campus context when it has the ability to take actions that would likely prevent harassment in the immediate vicinity of the campus." *Majority Opinion*, p. 30. Not exactly. The precise statement made in *Feminist Majority* was this:

> At bottom, in assessing whether [the university] . . . had sufficient control over the harassers *and* the context of the harassment we cannot conclude that [the university] could turn a blind eye to the *sexual harassment* that *pervaded and disrupted its campus* solely because the offending conduct took place through cyberspace.

911 F.3d at 688-89 (citation omitted) (emphases added).

Noticeably absent from the majority's paraphrasing is any similar reference to an on-campus connection to the harassing behavior. *See id.* Again, the holding in *Feminist Majority* does not support the majority's conclusion that the University of Arizona controlled the context of the off-campus harassment in this case.

In *Weckhorst v. Kansas State University*, the Title IX plaintiff was sexually assaulted at a University fraternity house. *See* 241 F. Supp. 3d 1154, 1157 (D. Kan. 2017). As the district court determined, the fraternity house was indisputably "a program or activity" of the University under Title IX. 20 U.S.C. § 1681(a). The University fraternities served as "student housing organizations that are open only to [University] students." *Weckhorst*, 241 F. Supp. 3d at 1158. The University described fraternities as "Kansas State University Organizations" on its website. *Id.* The

fraternities were overseen by the University, and importantly, the Director of the fraternity that was the situs of the sexual assault was an instructor at the University. *See id.* at 1159. The majority simply ignores these crucial factual distinctions in its analysis. *See Majority Opinion*, pp. 30-31.

Finally, *Roe ex. rel. Callahan v. Gustine Unified School District*, 678 F. Supp. 2d 1008 (E.D. Cal. 2009), involved the harassment of Plaintiff during his participation in a high school football camp at Liberty High School. *See id.* at 1011. Plaintiff was an incoming student at Gustine High School, and the football camp was "jointly coordinated by Gustine and Liberty High Schools." *Id.* In denying the motion for summary judgment filed by the Gustine Unified School District, the court referenced the joint sponsorship of the program, the supervisory role of teachers and coaches from Gustine High School, and the players' transportation to the camp in Gustine School District buses under the supervision of Gustine coaches. *See id.* at 1025. The court also observed that "[t]he football camp was governed by a [School District] Administrative Directive." *Id.* These circumstances were sufficient "to satisfy th[e] threshold inquiry" of substantial control over the context in which the harassment of Plaintiff occurred. *Id.* Once more, no similar facts exist in this case. Indeed, the majority merely recites the facts of *Roe* without even attempting to explain how these starkly divergent facts support the majority's attempt to attribute the off-campus harassment in this case to the University of Arizona without any tether to a program or activity of the University. *See Majority Opinion*, pp. 31-32.

### III. Conclusion

The facts of this case are disturbing. A football player at the University of Arizona physically assaulted Ms. Brown

and other female students at the University. However, because this case was brought under Title IX, the requirements of that statute must be met to provide relief to Ms. Brown. One of those requirements is that the University have "substantial control over the context in which the harassment occurr[ed]." *Davis*, 526 U.S. at 646. The physical assault of Ms. Brown took place in an off-campus house and unlike the fraternity house in *Weckhorst*, the University of Arizona had no connection to or involvement with the house. Unlike in *Feminist Majority*, the harassment did not occur on campus. Unlike in *Simpson*, the assault did not occur off-campus during a University-sanctioned activity. Unlike in *Roe*, the assault did not occur during a football camp sponsored by the school. Stated differently, the facts of this case lack any tether to a program or activity of the University, as contemplated by Title IX. The sole fact that the football coach granted Bradford permission to live off campus does not constitute "substantial control" over the context of the harassment as was present in the cases relied on by the majority. In the absence of this required tether to a program or activity of the University of Arizona, I must respectfully dissent.

---

R. NELSON, Circuit Judge, with whom RAWLINSON and LEE, Circuit Judges, join, dissenting:

Two control requirements must be satisfied for a school receiving federal funding to be liable under Title IX for student-on-student harassment: the school must exercise "substantial control over both the harasser and the context in which the known harassment occurs." *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 645 (1999). Today, the majority holds that the University of

Arizona controlled the context of Orlando Bradford's abuse of Mackenzie Brown in Bradford's off-campus house. Maj. Op. 35.

The trouble is, Brown expressly disclaimed that position below and before the three-judge panel on appeal, arguing instead that the control-over-context requirement was met because the University controlled Bradford's previous abuse of two other female university students. The majority asserts, misleadingly, that Brown merely raised a "narrower argument" before our en banc court. *Id.* at 22. What the majority fails to acknowledge or address is that this argument was not only not raised, but affirmatively abandoned. By embracing an argument that Brown affirmatively disavowed, the majority encourages future plaintiffs to hide the ball on their arguments for strategic litigation advantage. Indeed, the University is now forced to proceed to trial on a legal theory that was not the subject of discovery or pursued below. That is not good judicial process.

But the majority gets the merits wrong as well. I largely agree with Judge Rawlinson's dissent. I also share many of Judge Lee's concerns about how Title IX jurisprudence has strayed from the text and meaning of the statute. But the majority is incorrect even under existing precedent. The majority's holding rests on the determination that a school has control over the context of harassment as long as the school has disciplinary authority over the harasser in the setting in which the harassment takes place. *Id.* at 27. No other court has gone as far as the majority does. Schools, like the University here, generally exercise wide-reaching disciplinary authority over their students without geographic limitation. In other words, when a school has disciplinary authority over the harasser it will nearly always have

disciplinary authority in the setting of the harassment. As a result, the control-over-harasser requirement now swallows the control-over-context requirement, at least in our circuit. A single disciplinary-control requirement is all that remains—unmoored from Title IX's targeted directive of prohibiting discrimination in education programs and activities, irreconcilable with the Supreme Court's instruction in *Davis* that a school must have control over both the harasser and the context of the harassment, and without meaningful limits on a school's liability for student-on-student abuse claims. We can't ignore *Davis* and we can't overrule the Supreme Court implicitly either.

I would stick to deciding the questions presented by the parties. And even if it were proper to decide whether the University had control over the context of the abuse Brown suffered, like Judge Rawlinson, I would preserve the Supreme Court's distinction between control over the harasser and control over the context of the harassment. In this case, the evidence shows that the University did not control the context of Bradford's abuse of Brown. I respectfully dissent.

I

Bradford was a scholarship athlete on the University football team. He was subject to team rules and disciplinary policies. For part of his freshman year, Bradford lived off campus in violation of the team rule requiring freshmen to live on campus. The summer after his freshman year, Bradford moved to a different private, off-campus house. Others lived in the house as well, including a nonstudent.

Near that time, Bradford started dating Brown, also a University student. Brown regularly spent time at Bradford's house and often stayed overnight. While they

were dating, Bradford physically abused Brown. The assaults that form the primary basis for Brown's Title IX claim happened on two successive days during the fall of 2016, though Brown testified that Bradford physically abused her four to ten times in total. These assaults occurred at Bradford's off-campus residence. He pushed her to the floor, hit her, dragged her by the hair, choked her, and threatened her. Bradford was arrested for these assaults and pleaded guilty to two counts of felony aggravated assault and domestic violence. He was sentenced to five years in prison. Bradford was suspended from the football team and the University on the day of his arrest and later expelled.

## II

Brown claims that the University is liable under Title IX for these assaults. In *Davis*, the Supreme Court recognized a Title IX claim for student-on-student harassment only when a school acts with deliberate indifference to known acts of harassment in its programs or activities. 526 U.S. at 633. The Court set forth several requirements for such a claim to succeed, including that the school must exercise "substantial control over both the harasser and the context in which the known harassment occurs." *Id.* at 645; *see also Karasek v. Regents of Univ. of Cal.*, 956 F.3d 1093, 1105 (9th Cir. 2020) (separating *Davis*'s requirements into five elements).

In the district court and her appeal to this court, Brown argued that "the focus of the 'substantial control' requirement must always be on the context of the harassment that the university is being accused of failing to correct—or of inviting due to its official policies." Brown maintained that the University was liable for her abuse because it failed to address Bradford's prior abuse of two other female

students: Student A and Lida DeGroote.  Brown explained that "[u]nlike many Title IX plaintiffs, [she] does not fault the University for its response to her own attack," instead, her attack "is alleged to be an *effect* of the University's previous Title IX violation, not an event that itself triggered the University's Title IX obligations."  Thus, she argued, the "important question as to the University's control . . . is whether the University had control over the context of *those* attacks," that is, Bradford's abuse of Student A and DeGroote.  In other words, "[t]he question is whether the University had sufficient control over the context in which [Brown] alleges that it failed to act, not whether it had sufficient control over the context in which she was later attacked."

Her reply brief reiterated this position.  She contended that the control-over-context requirement "applies to the harassment that the University is alleged to have known about and ignored (primarily the harassment of Student A), not to the harassment that [Brown] is alleged to have later suffered as a consequence."  Indeed, she argued:

> The University's confusion regarding th[e] [control-over-context] element of the claim stems from its persistent misidentification of the Title IX violation alleged by [Brown]. The act for which [Brown] seeks to hold the University responsible is not Bradford's September 2016 attack in the off-campus house rented by the football players, but rather the University's deliberate indifference to Bradford's reported on-campus attacks and harassment (primarily of Student A).  (The University has never challenged its control over

the dormitories.) [Brown's] claim is not, in other words, that federally-funded schools should be guarantors of the off-campus safety of their students, but rather simply that they should be held responsible if they act with deliberate indifference toward known acts of on-campus dating violence and harassment.

All three members of the original panel, including the dissenting judge, rejected the only argument that Brown made: that the control-over-context requirement could be satisfied by the University's control over the separate context of Bradford's abuse of Student A and DeGroote. *Brown v. Arizona*, 23 F.4th 1173, 1179–81 (9th Cir. 2022); *id.* at 1193 (W. Fletcher, J., dissenting) ("Brown argues that because the University had control over the context of Bradford's known harassment of Student A and DeGroote, the University's failure to take action violates Title IX without respect to whether the University had control over Bradford's off-campus housing. . . . I would not go so far . . . ."). The panel agreed that, to satisfy the control-over-context element, Brown had to show that the University controlled the context of her own abuse. *Id.* at 1180, 1193. The majority determined that "Brown does not argue that the University controlled the off-campus environment in which she was assaulted." *Id.* at 1180. But despite Brown's disavowal of that argument, the panel dissenter sua sponte concluded that the University had control over the context of Bradford's abuse of Brown in his off-campus house. *Id.* at 1195.

Brown took up the panel dissent's argument for the first time before our en banc court. Indeed, she had to seek the court's leave to file a supplemental brief addressing her new

argument because, as Brown explained, "[t]he vacated panel opinion in this case reached an issue . . . that was not the subject of adversarial party briefing."  Today, the majority adopts Brown's new position, inspired by the original panel dissent, and holds that the University controlled the context of Bradford's abuse of Brown.  Maj. Op. 35.

To her credit, Judge Friedland recognizes in her concurrence that Brown affirmatively disavowed the argument the majority adopts.  Conc. Op. 44.  The majority tries to evade Brown's original disavowal of this argument by concluding that Brown simply "made a narrower argument" before our en banc court.  Maj. Op. at 22.  This seriously mischaracterizes the story.

Brown, represented by counsel throughout these proceedings, had every opportunity to argue that the University controlled the context of her abuse.  But Brown argued before the district court that the University's control over Bradford's previous abuse of Student A and DeGroote satisfied the control-over-context requirement.  The district court rejected this argument, leaving no doubt that it granted summary judgment because "[w]hile it is undeniable that [the University] exercised substantial control over Bradford, [Brown] has not offered any evidence that [the University] exercised control over the context in which her abuse occurred."  Brown knew that her claim failed in the district court because the University lacked control over the context of *her* abuse, and she could have challenged that conclusion on appeal if she chose.

She chose not to.  On appeal, Brown doubled down on her argument, repeatedly and emphatically maintaining that her claim was directed at the University's deliberate indifference toward Bradford's previous abuse.  She argued

that "[t]he question is whether the University had sufficient control over the context in which [Brown] alleges that it failed to act, not whether it had sufficient control over the context in which she was later attacked." She characterized the University's arguments directed at her own abuse as the source of the University's "confusion" and its "persistent misidentification" of her Title IX claim. The control-over-context requirement, she argued, "applies to the harassment that the University is alleged to have known about and ignored (primarily the harassment of Student A), not to the harassment that [Brown] is alleged to have later suffered as a consequence." Make no mistake, Brown affirmatively disclaimed the majority's position.[1]

This is waiver, in the true sense of the word. "The terms waiver and forfeiture—though often used interchangeably by jurists and litigants—are not synonymous." *Hamer v. Neighborhood Hous. Servs. of Chi.*, 138 S. Ct. 13, 17 n.1 (2017). Our own caselaw is rife with misuse of the terms— we have often stated that an argument, issue, or claim is "waived" when we really mean "forfeited." Waiver is the "intentional relinquishment or abandonment of a known right." *Id.* (citation omitted). Forfeiture is the "failure to make the timely assertion of a right." *Id.* (citation omitted). In civil and criminal cases, waiver has harsher consequences than forfeiture. *United States v. Lopez*, 4 F.4th 706, 719 n.3 (9th Cir. 2021) ("Waiver is the intentional relinquishment or abandonment of a known right and entirely precludes appellate review." (cleaned up)); *Crowley v. Epicept Corp.*,

---

[1] Like the original panel, I would reject Brown's assertion that the control-over-context requirement can be satisfied by the University's control over Bradford's previous assaults. *See Brown*, 23 F.4th at 1180–81, 1193. *Davis* requires that the plaintiff suffered harassment under the operations of the institution. 526 U.S. at 644–45.

883 F.3d 739, 748 (9th Cir. 2018) ("Forfeited rights are reviewable for plain error, while waived rights are not."); *see also Claiborne v. Blauser*, 934 F.3d 885, 893 (9th Cir. 2019).

Adopting Brown's disclaimed position also implicates the party presentation principle: "It is the parties who 'frame the issues for decision,' and we may entertain only those arguments 'bearing a fair resemblance to the case shaped by the parties.'" *AMA Multimedia, LLC v. Wanat*, 970 F.3d 1201, 1214 (9th Cir. 2020) (quoting *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579, 1582 (2020)); *see also Baccei v. United States*, 632 F.3d 1140, 1149 (9th Cir. 2011) ("[W]e will not reframe an appeal to review what would be in effect a different case than the one decided by the district court."). In *Sineneng-Smith*, the Supreme Court held that our court violated the party presentation principle when the panel invited amici to brief and argue issues never raised by the parties and then adopted those arguments in the disposition. 140 S. Ct. at 1581. The Supreme Court taught that "our system is designed around the premise that parties represented by competent counsel know what is best for them, and are responsible for advancing the facts and argument entitling them to relief, . . . courts are essentially passive instruments of government." *Id.* at 1579 (cleaned up).

As both the majority and the concurrence point out, Maj. Op. 22; Conc. Op. 45–46, "we have authority and discretion to decide questions first raised in a petition for rehearing *en banc*." *United States v. Hernandez-Estrada*, 749 F.3d 1154, 1159 (9th Cir. 2014) (en banc). And if the parties address issues in a petition for rehearing en banc or en banc supplemental briefing that were not previously raised, "[t]he party-presentation principle is not implicated . . . because the parties themselves have 'frame[d] the issue for

decision.'" *Lee v. Fisher*, 70 F.4th 1129, 1154 (9th Cir. 2023) (en banc) (second alteration in original) (quoting *Sineneng-Smith*, 140 S. Ct. at 1579).

As mentioned above, our caselaw regularly mixes up waiver and forfeiture.  Despite using the term "waiver," each of the cases cited by the majority and concurrence suggesting that our en banc court can address Brown's disavowed argument really involve forfeiture.  *Id.* ("Lee failed to identify [the] Section 115 [issue] in her opening brief before the panel . . . ."); *Hernandez-Estrada*, 749 F.3d at 1159 ("Hernandez has waived his challenge to the absolute disparity test by not specifically raising it before the three judge panel."); *Socop-Gonzalez v. INS*, 272 F.3d 1176, 1186 n.8 (9th Cir. 2001) (en banc), *overruled on other grounds by Smith v. Davis*, 953 F.3d 582, 599 (9th Cir. 2020) (en banc) ("[F]ailure to raise an issue before an original appellate panel does not preclude an *en banc* panel's jurisdiction over the issue.").  The majority and concurrence cite no case in which we have adopted an argument that was affirmatively disclaimed by a party.  There is no precedent supporting what the majority is actually doing here.**[2]**

Even if we can exercise discretion to address Brown's disclaimed argument, we shouldn't.  Brown made a conscious choice, and that choice should carry consequences.  *See Porter v. Martinez*, 68 F.4th 429, 440 n.6 (9th Cir. 2023) (rejecting the dissent's argument because the plaintiff "expressly disavowed" it, instead "[t]aking [the

---

[2] As Judge Friedland aptly notes, the en banc court should be free to correct substantive errors by the three-judge panel on disavowed arguments.  Conc. Op. 45–46.  But that can easily be done by vacating the three-judge panel opinion.  The en banc panel should not repeat the error of addressing a disavowed argument.

plaintiff] at her word" and addressing only the argument she advanced).  Enforcing waiver here would "'preserve the integrity of the appellate structure' by ensuring that 'an issue must be presented to, considered and decided by the trial court before it can be raised on appeal.'"  *Honcharov v. Barr*, 924 F.3d 1293, 1295 (9th Cir. 2019) (per curiam) (quoting *Torres de la Cruz v. Maurer*, 483 F.3d 1013, 1023 (10th Cir. 2007)).  Enforcing waiver "encourage[s] the orderly litigation and settlement of claims by preventing parties from withholding 'secondary, back-up theories' at the trial court level, thus allowing party-opponents to appraise frankly the claims and issues at hand and respond appropriately."  *Id.* (quoting *Torres de la Cruz*, 483 F.3d at 1023).  The majority's opinion subverts the established appellate structure and encourages future gamesmanship.

Indeed, the University suffers prejudice here, having been unable to develop facts geared toward the majority's theory.  Discovery has concluded.  On remand, the case will likely proceed to trial on a legal question that Brown affirmatively abandoned.  The parties have not had the opportunity for proper discovery to address these claims.  It is hard to imagine a more unfair process for the University.[3]

The majority also says that only claims can be waived, not arguments.  *See* Maj. Op. 23.  But we regularly hold that arguments can be waived or forfeited.  *See*, *e.g.*, *Freedom from Religion Found., Inc. v. Chino Valley Unified Sch. Dist. Bd. of Educ.*, 896 F.3d 1132, 1152 (9th Cir. 2018) (per

---

[3] Assuming the majority's position, I agree with Judge Friedland's suggestion that discovery should be reopened.  Conc. Op. 46. Unfortunately, that position has not garnered a majority of the en banc panel.  But hopefully the district court will exercise its discretion to do so.

curiam) ("[T]he [defendant] has chosen not to argue the issue on appeal. This is waiver—the intentional relinquishment or abandonment of a known right or privilege." (internal quotation marks and citation omitted)); *GoPets Ltd. v. Hise*, 657 F.3d 1024, 1033 (9th Cir. 2011) ("The [defendants] waived that argument by failing to present it to the district court in a timely fashion."); *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999) ("[A]n appellate court will not consider issues not properly raised before the district court. Furthermore, on appeal, arguments not raised by a party in its opening brief are deemed waived."). Despite this standard practice, the majority identifies our separate line of cases, Maj. Op. 23, mirroring the Supreme Court's approach that "it is claims that are deemed waived or forfeited, not arguments." *United States v. Pallares-Galan*, 359 F.3d 1088, 1095 (9th Cir. 2004); *accord Allen v. Santa Clara Cnty. Corr. Peace Officers Ass'n*, 38 F.4th 68, 71 (9th Cir. 2022) (per curiam) ("The Employees' argument . . . is not a new claim but is, instead, a new argument in support of their consistent claim.").

Unlike most situations where we are bound to follow the Supreme Court, application of the waiver rule by a court of appeals may appropriately differ because the Supreme Court has a discretionary docket. Our line of cases applying the Supreme Court's waiver rule disregards certain unique characteristics of the Supreme Court—that "[a]ny argument in support of a pleaded 'claim' may be raised in a petition for writ of certiorari" and that "only the questions presented in the petition for writ of certiorari are reviewed." Chris Goelz et al., *Rutter Group Practice Guide: Federal Ninth Circuit Civil Appellate Practice* ¶ 7:83.5 (2023); *see also id.* at ¶ 7:83.9 (explaining that Ninth Circuit cases adopting the Supreme Court's waiver standard "typically do not address

aspects of the U.S. Supreme Court's waiver standards that are unique to that Court or explain how and why they should be applied in the Ninth Circuit . . . . For this reason, it is not possible to completely reconcile all Ninth Circuit opinions discussing waiver"). At any rate, concluding that waiver and forfeiture only apply to claims abandons voluminous caselaw in which we have applied these rules to arguments. *See*, *e.g.*, *Freedom from Religion Found.*, 896 F.3d at 1152.

In short, the majority's analysis and holding adopt a theory that was affirmatively disclaimed in the district court and on appeal, and entered the equation only because the dissenting judge on the original panel interjected it on his own. This absolves Brown of the consequences of her deliberate litigation strategy and creates significant consequences for future litigants in our circuit. Crafty litigants will "withhold[] secondary, back-up theories at the trial court level,"—even affirmatively disclaim them—to prevent "party-opponents" like the University here from "apprais[ing] frankly the claims and issues at hand and respond[ing] appropriately." *See Honcharov*, 924 F.3d at 1296. Whether or not our en banc court has discretion to address Brown's waived theory, we should "adjudicat[e] [this] appeal attuned to the case shaped by the parties rather than the case designed by the appeals panel." *See Sineneng-Smith*, 140 S. Ct. at 1578.

III

I remain firm that Brown's waived argument should not be addressed. But because the majority has chosen to address a waived argument, I find it appropriate to respond. The majority incorrectly concluded that the University controlled the context here. A Title IX claim for student-on-student harassment requires control over both the harasser

and the context of the harassment. *Davis*, 526 U.S. at 645. Addressing Brown's Title IX claim on summary judgment, I would hold that the record does not show a genuine dispute of material fact about whether the University controlled the context of Bradford's abuse of Brown in his off-campus house.

A

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Protecting against discrimination in education programs was the motivating concern behind the Supreme Court's recognition of a Title IX claim for student-on-student harassment. *See Davis*, 526 U.S. at 651 ("[A] plaintiff must establish sexual harassment of students that is so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that the victim-students are effectively denied equal access to an institution's resources and opportunities."). To that end, the Supreme Court outlined certain requirements that must be satisfied for a plaintiff to prevail on a Title IX student-on-student harassment claim. *Id.* at 643–50. Consistent with the Court's firm instruction that a school may be liable "only for its own misconduct," one requirement is that the school must have "some control over the alleged harassment." *Id.* at 640, 644. Control over the alleged harassment has two components: control over the harasser and control over the "context" or "environment" in which the harassment occurs. *Id.* at 644–45. As to the control-over-context requirement, the Court stressed that "the harassment must take place in a context subject to the school['s] control," *id.* at 645, because

Title IX prohibits discrimination "under any education program or activity," § 1681(a). Education "program or activity" is defined as "the operations of" an educational institution subject to Title IX. *Davis*, 526 U.S. at 645 (quoting 20 U.S.C. § 1687).

The Court emphasized that control over the "context" or "environment" of the harassment was a separate requirement from control over the harasser. *Id.* at 644–45. But the majority fails to heed that instruction. I agree with the majority that the control-over-context requirement involves more than just the geographic location of the harassment and that this requirement can be satisfied in off-campus settings. Maj. Op. 32. But even in off-campus settings, some element of school sanction, sponsorship, or connection to a school function is required. *See Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1121 n.1 (10th Cir. 2008) ("*Davis* suggests that there must be some nexus between the out-of-school conduct and the school."). This tethers the control-over-context requirement to the statute, which prohibits "discrimination under any education program or activity," § 1681(a), meaning that the harassment "must occur 'under' 'the operations of'" a school, *see Davis*, 526 U.S. at 645 (quoting §§ 1681(a), 1687). The statute's text, the Supreme Court emphasized, requires that the harassment "have the systemic effect of denying the victim equal access to an educational program or activity" and "cabins the range of misconduct that the statute proscribes." *Id.* at 644, 652.

The cases the majority relies on are in harmony with this understanding. In *Simpson v. University of Colorado Boulder*, 500 F.3d 1170 (10th Cir. 2007), the sexual assaults happened during a university football team recruiting visit, in which the team brought high school students to campus

and paired them with "female 'Ambassadors'" and "player-hosts" who "were responsible for the recruits' entertainment." *Id.* at 1173. The recruits were taken to an off-campus apartment, where players and recruits sexually assaulted two female students. *Id.* at 1180. This was not just a private party—the recruits were taken to the off-campus apartment as part of the recruiting trip activities that the team facilitated and organized to show the recruits a "good time." *See id.* at 1173. The court explained that "[t]he alleged assaults were not simply misconduct that happened to occur at [the university] among its students. Plaintiffs allege that the assaults arose out of an official school program, the recruitment of high-school athletes." *Id.* at 1174. Although *Simpson* focused on the actual-notice and deliberate-indifference elements, *see id.* at 1174, 1184–85, the court also concluded that "[i]mplementation of an official policy can certainly be a circumstance in which the recipient exercises significant 'control over the harasser and the environment in which the harassment occurs.'" *Id.* at 1178 (quoting *Davis*, 526 U.S. at 644).

In *Feminist Majority Foundation v. Hurley*, 911 F.3d 674 (4th Cir. 2018), university students posted anonymous messages on a social media platform that disparaged, harassed, and threatened the plaintiffs. *Id.* at 680–82. Holding that the plaintiffs' Title IX claim survived a motion to dismiss, the Fourth Circuit concluded that the control-over-context requirement was sufficiently alleged because the harassing posts "actually transpired on campus." *Id.* at 687. The posts "originated on or within the immediate vicinity of" campus, were posted using the university's wireless network, and "concerned events occurring on campus and specifically targeted [university] students." *Id.*

In *Weckhorst v. Kansas State University*, 241 F. Supp. 3d 1154 (D. Kan. 2017), *aff'd sub nom. Farmer v. Kansas State University*, 918 F.3d 1094 (10th Cir. 2019), the female plaintiff was sexually assaulted by a male student in his vehicle and again in his off-campus fraternity house. *Id.* at 1159. Addressing the plaintiff's Title IX claim at the motion-to-dismiss stage, the district court held that the control-over-context requirement was satisfied because the "fraternity allegedly is a [university] student organization, is supervised by a faculty advisor, is overseen by [the university's] Office of Greek Affairs, is subject to [university] rules specifically applicable to fraternity parties and events, and was suspended by [the university] for conduct at the party where Plaintiff was assaulted." *Id.* at 1170.

The district court distinguished two Eighth Circuit cases involving sexual assault by fraternity members where the control-over-context requirement was not satisfied, concluding that the assaults in those cases happened "at a private residence that was not owned by the fraternity or the university," *id.* at 1167 (citing *Ostrander v. Duggan*, 341 F.3d 745, 750–51 (8th Cir. 2003)), and "at a party at an off-campus apartment," *id.* (citing *Roe v. St. Louis Univ.*, 746 F.3d 874, 884 (8th Cir. 2014)). The district court determined that "[h]ere, by contrast, the alleged assaults that give rise to Title IX liability took place at a house owned by the fraternity and at a fraternity event, and Plaintiff's allegations reflect that [the university] exercises substantial control over the fraternity." *Id.* at 1170.

In *Roe ex rel. Callahan v. Gustine Unified School District*, 678 F. Supp. 2d 1008 (E.D. Cal. 2009), the plaintiff was assaulted during a school-sponsored summer football camp. *Id.* at 1013–14. Although the football camp was at a

different high school, the district court held that the control-over-context requirement was satisfied because "the football camp was sponsored and promoted by [the school], its football coaches and administrators, was a core part of [the school's] football program, and was under the supervision of [school] teachers and/or football coaches." *Id.* at 1025.

In each of these cases, an element of school sanction, sponsorship, or connection to a school function existed. *See Hurley*, 911 F.3d at 687 (harassment originated on or near campus, used the university's wireless network, and concerned events on campus); *Simpson*, 500 F.3d at 1173 (assaults happened as part of university football team recruiting activities); *Weckhorst*, 241 F. Supp. 3d at 1170 (assault happened at a house owned by a fraternity (a university student organization) at a fraternity event); *Roe*, 678 F. Supp. 2d at 1025 (assault happened at a school-sponsored football camp); *see also Foster v. Bd. of Regents of Univ. of Mich.*, 982 F.3d 960, 970 (6th Cir. 2020) (en banc) (contrasting misconduct "over which the University has no control," including Facebook comments and emails, with misconduct "[i]t could and did control," that is, "classes, social events, ceremonies, and the like").

This case has no similar indicia that the University controlled the context of Bradford's abuse of Brown. Bradford attacked Brown in his off-campus house. The house was not owned by or affiliated with the University, nor did the abuse occur in connection with a University function. The abuse here is akin to that in the two Eighth Circuit cases distinguished by the district court in *Weckhorst*, where the abuse occurred "at a private residence that was not owned by the fraternity or the university," 241 F. Supp. 3d at 1167 (citing *Ostrander*, 341 F.3d at 750–51), and "did not occur under a university 'program or activity,'"

*id.* (citing *Roe*, 746 F.3d at 884). Because the University did not control the context of Bradford's abuse of Brown, the district court properly granted summary judgment to the University.

B

In the majority's view, none of this matters because "a key consideration is whether the school has some form of disciplinary authority over the harasser in the setting in which the harassment takes place." Maj. Op. 26. This determination stems from the majority's understanding of the Supreme Court's conclusion in *Davis* that "recipients of federal funding may be liable for 'subject[ing]' their students to discrimination where the recipient is deliberately indifferent to known acts of student-on-student sexual harassment and the harasser is under the school's disciplinary authority." 526 U.S. at 646–47.

The majority characterizes this conclusion from *Davis* as the Supreme Court's "articulat[ion] [of] its holding on the 'control' element." Maj. Op. 26. That is incorrect. In this passage, the Court first stated the dual requirement that a school must "exercise[] substantial control over both the harasser and the context in which the known harassment occurs." *Davis*, 526 U.S. at 645. In the next paragraph, the Court applied those two control requirements to the facts of the case. It first found that the school easily satisfied the control-over-context requirement because "the misconduct occur[red] during school hours and on school grounds." *Id.* at 646.

With the control-over-context requirement squared away, the Court distinctly transitioned to the control-over-harasser requirement. *Id.* ("In these circumstances, the recipient retains substantial control over the context in which

the harassment occurs.  More importantly, however, in this setting the [school board] exercises significant control over the harasser.").  The Court then discussed whether the school had control over the harasser, emphasizing the school's disciplinary authority over its students. *Id.* at 646–47.  The paragraph concludes with the statement the majority mischaracterizes as a summary of the entire control element. *Id.*

This passage from *Davis* makes evident that the Court's conclusion about schools being liable when "the harasser is under the school's disciplinary authority" is not a summary of the entire control element, but a conclusion specific to the control-over-harasser requirement.  *See id.*  Reading the statement any other way eviscerates the distinction between the control-over-context requirement and the control-over-harasser requirement that the Court had just finished explaining in its last breath.  It also ignores Congress's directive that conduct is actionable only if it occurs "under an[] education program or activity."  § 1681(a).

Cases the majority relies on also read *Davis* this way. *See Hurley*, 911 F.3d at 688 ("The substantial control analysis also requires us to consider the educational institution's control over the harasser, especially its 'disciplinary authority.'" (quoting *Davis*, 526 U.S. at 647)); *Weckhorst*, 241 F. Supp. 3d at 1167 (recognizing that "disciplinary control" is relevant to whether the university "had substantial control over the alleged assailants" (citing *Davis*, 526 U.S. at 646–47)).  The majority's holding dismantles the Supreme Court's two separate control requirements and makes disciplinary authority the sole touchstone for evaluating a school's control.

This new disciplinary-control requirement is remarkably unlimited.  In this case, for instance, the University would be potentially liable for harassment by any student in any location.  The University's off-campus disciplinary authority is not limited to football players, or even athletes.  As the majority recognizes, the University's Student Code of Conduct is "applicable to all students" and "applies to student conduct 'both on-campus and off-campus.'"  Maj. Op. 33.

Now that disciplinary authority is enough to establish the control-over-context requirement, there are no discernible limits on the circumstances that could create Title IX liability.  Schools could be liable for what happens within completely private, unsupervised settings such as spring break trips abroad, online communication, and students' family homes.

This is no hypothetical parade of horribles.  Consider a situation from the record.  Brown testified that she was with Bradford in a Goodyear Tire store waiting for a tire repair. Bradford became upset upon seeing a contact named "Josh" in Brown's phone, and she testified that "he like grabbed my arm and dug his nails into my arm.  I have a scar."  The University and the football team's disciplinary authority over Bradford was fully operative in the Goodyear Tire store, just as it was in his off-campus house.  Does that mean the University controlled the context of the abuse in the tire store?  Under the majority's reasoning, the answer must be yes.  This outcome bears no resemblance to the Supreme Court's teaching that "because the harassment must occur 'under' 'the operations of' a funding recipient . . . the harassment must take place in a context subject to the school district's control," thereby "denying the victim equal access

to an educational program or activity." *See Davis*, 526 U.S. at 645, 652 (quoting §§ 1681(a), 1687).

The majority stretches the record to assert that "[t]here is undisputed evidence that the University had control over the off-campus housing in which Bradford was living while attending the University." Maj. Op. 32. First, the majority asserts that Bradford was allowed to live off campus only with permission of his coaches and that his "permission to live off campus was conditioned on good behavior." *Id.* Both assertions overstate the evidence. There is no evidence that Bradford ever requested or received permission to live off campus. Coach Rodriguez only testified that this was the general rule. In fact, Bradford had lived off campus as a freshman in violation of the rule that team freshmen must live in the on-campus dorms. *Id.* at 33–34. Coach Rodriguez testified that he had never enforced the rule requiring permission to live off campus to make a player move back to the dorms. The majority's assertion that Bradford lived off campus because his coaches gave permission is unsupported by the record. *See id.* at 32.

Nor did Coach Rodriguez testify that permission to live off campus was conditioned on general good behavior. *See id.* He testified that permission was based on academic performance and punctually keeping appointments: "as long as they were doing okay academically and, you know, not being irresponsible as far as making their appointments and practices and meetings and everything else on time, they could move off-campus." Coach Rodriguez's testimony indicates that requiring a player to move on campus was a disciplinary measure for problems associated with living away from campus, that is, failing to attend classes and other appointments. There is no evidence that this punishment was used to generally police player behavior.

But even if Bradford were living off campus with permission from the coaching staff and his permission could have been revoked for bad behavior, that evidence only shows that the University had control over Bradford—not the context in which he abused Brown. The ability to make Bradford move back on campus does not mean the University owned or otherwise controlled Bradford's off-campus house, nor that Bradford's abuse of Brown was connected to any University function. Once again, the majority conflates the control-over-harasser requirement with the control-over-context requirement. *See Davis*, 526 U.S. at 645.

Second, the majority relies on Coach Rodriguez's testimony that if he had known about Bradford's abuse earlier, he would have kicked Bradford off the team earlier. Maj. Op. 34. The majority infers that "had [Coach] Rodriguez known of Bradford's assaults on Student A and DeGroote, Bradford's September 12 and 13 assaults on Brown at his off-campus house would never have occurred" and he "likely would have been expelled from the University." *Id.* at 2–3, 34. The majority also speculates that "[e]ven if [Bradford] had engaged in lesser misconduct, he would never have been permitted to live off campus while a member of the team." *Id.* at 34.

The record contains no evidence that Bradford would have been expelled if he had been kicked off the team earlier. Nor is there evidence that he would have been barred from living off campus for engaging in "lesser misconduct." *See id.* Of course, many scenarios exist concerning what might have happened if Bradford had been kicked off the team earlier. Perhaps it would have changed circumstances such that his abuse of Brown would not have happened. Or, Bradford might have continued living in his private off-

campus house and had the opportunity to abuse Brown there regardless. The University could not have prevented Bradford from living in the house if it expelled him. *See Foster*, 982 F.3d at 970 ("Expulsion would not have prevented many of the harassing acts . . . because they lay beyond the school's control."). Here, the majority relies only on its own speculation about what might have happened if Bradford was kicked off the team earlier to conclude that the University controlled the context of this abuse. *See Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081–82 (9th Cir. 1996) ("[M]ere allegation and speculation do not create a factual dispute for purposes of summary judgment.").

But even accepting the majority's chain of events as true, Coach Rodriguez's testimony that he would have kicked Bradford off the team earlier had he known about Bradford's abusive behavior is again only evidence of the University's control over the harasser, not control over the context. This is but another example of disciplinary control over Bradford, which is separate from the requirement that the University must control the context of the abuse. *See Davis*, 526 U.S. at 645.

Third, the majority relies on an expert report to show that "the University had control over where Bradford lived." Maj. Op. 35. But the expert report runs into the same problem. That student-athletes like Bradford "are told where they can live, where and when they will be places— including practices, games, housing, meals, and study time" speaks to the University's disciplinary control over Bradford—the control-over-harasser requirement. *Id.* As the expert described, the University's control over Bradford was not limited to any particular setting. If that disciplinary authority is enough, then the University would control virtually any context involving Bradford.

Fourth, the majority also states that Bradford lived in his off-campus house "with other members of the football team" and describes the house as a "players' residence." *Id.* at 32. Brown and the United States as amicus curiae go further, characterizing Bradford's off-campus house as a "de facto football-team house" and "the team house." The record belies this description. Bradford did not "live[] exclusively with other football players," as the United States asserts. The evidence shows that Bradford lived with at least one non-student. There is no evidence that Bradford's off-campus house was affiliated with the football team, formally or otherwise. Thus, the majority is wrong to say that the "very existence" of Bradford's off-campus house was "subject to the coaches' control." *See id.*

\*\*\*

In short, the record does not show that the harassment here "t[ook] place in a context subject to the [University's] control." *See Davis*, 526 U.S. at 645. Brown was abused in a private, off-campus house. The University's disciplinary control over Bradford supports control over the harasser, but not control over the context of the harassment. *See id.* Brown has shown no element of school sanction, sponsorship, or connection to a school function associated with the abuse. The harassment therefore did not "occur under the operations of" the University, and the control-over-context requirement was not satisfied. *See id.* (cleaned up).

IV

The majority's holding rests on a theory that Brown affirmatively disclaimed. And that holding improperly conflates *Davis*'s control-over-context and control-over-harasser requirements. Bradford abused Brown in a private,

off-campus residence unconnected to any school function. Thus, the district court properly determined that the University did not control the context of the harassment and granted summary judgment.

Aside from holding that *Davis*'s control requirements are satisfied, the majority also holds, Maj. Op. 44, that Brown survives summary judgment on the "actual knowledge" and "deliberate indifference" requirements of a Title IX student-on-student harassment claim. *See Karasek*, 956 F.3d at 1105. The majority does not address the requirement that "the plaintiff must have suffered harassment that is so severe, pervasive, and objectively offensive that it can be said to deprive the plaintiff of access to the educational opportunities or benefits provided by the school" or the requirement that "the school must have caused the plaintiff to undergo harassment or made the plaintiff liable or vulnerable to it." *Id.* (cleaned up). Because I would grant the University's motion for summary judgment based on the University's lack of control over the context of Bradford's abuse of Brown, I would not reach the other requirements of a Title IX student-on-student harassment claim.

I respectfully dissent.

---

LEE, Circuit Judge, with whom RAWLINSON, Circuit Judge, joins, dissenting:

I join Judge Rawlinson's persuasive dissent but write separately to detail further how courts have drifted from the text of Title IX. Like Judge Rawlinson and the majority, I am disturbed by the facts of the case. Orlando Bradford rightfully received a five-year prison sentence for brutally assaulting his girlfriend in his off-campus house. The

University of Arizona administrators and employees who failed to protect her should also be held accountable— whether it be losing their jobs or facing other discipline.

But as horrendous as the facts are, this should not be a Title IX case. It stretches the text and meaning of the statute to say that Bradford's criminal actions—and the University's oversight—amount to "discrimination under an[] education program or activity receiving Federal financial assistance." *See* 20 USC § 1681(a). Simply put, a criminal act by a student in an off-campus house does not implicate an "education program or activity" under Title IX. I thus respectfully—and reluctantly—dissent.

\* \* \* \* \*

Congress enacted Title IX to bar sex discrimination in federally funded schools. It states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under *any education program or activity* receiving Federal financial assistance." 20 USC § 1681(a) (emphasis added). Title IX has had a far-reaching and salutary impact in rooting out sex discrimination in schools. No longer can schools discriminate against female students in awarding scholarships or making admissions decisions because doing so "excludes" and "denies" benefits under an "education program or activity" on the basis of sex. Nor can schools provide more funding for boys' sports programs than girls' because athletics are an "education program or activity" that require equal treatment.

Over the years, however, courts have expanded the reach of Title IX beyond its text. The plain language of Title IX strongly suggests that it bars discrimination *by the school* receiving federal funds: It prohibits students from being

"excluded, "denied the benefits," or being "subjected to discrimination under any education program or activity" (*i.e.*, it is the school that discriminates against students "under" the school's policy or actions). *See Davis v. Monroe Cnty. Bd. Of Ed.*, 526 U.S. 629, 659-62 (1999) (Kennedy, J., dissenting). Indeed, the Supreme Court has held that Title IX does not impose vicarious liability on the school just because, say, a student discriminates against a student. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998).

But the Court faced a set of ugly facts in *Davis*: A fifth-grader waged a terrible campaign of sexual harassment and abuse against his classmate, yet the school did little to stop it. 526 U.S. at 633-35. The Court found a private right of action under Title IX, holding that the student can seek damages from the school for failing to address student-on-student harassment. In other words, the Court held that schools in some cases could be liable under Title IX for harassment perpetrated by students, even though the text of the statute suggests otherwise. But recognizing that Title IX does not allow vicarious liability, the Court tried to cabin in that possibility by fashioning a multi-pronged test that required, among other things, schools to have "substantial control over both the harasser and the context in which the known harassment occurs." *Id.* at 645. That "context" prong ensured that a school would not be held liable if a student, for example, harassed other students at a mall because that would not have occurred under an "education program or activity." And under the facts of *Davis*, the Court's new test perhaps made sense, even if it veered from the text of the statute: The school had notice of and control over what happened in the classroom, and yet did little to prevent it.

Our case law has drifted so far from Title IX's text that the majority barely discusses how an "education program or

activity" is implicated by a student committing a violent crime in an off-campus house.  Instead of looking at the statutory text, the majority jumps straight to the *Davis* factors.  The facts here, however, are significantly different from *Davis*.  Unlike *Davis* and other Title IX cases, the facts here do not involve an educational "program" (*e.g.*, incidents in a classroom, athletic programs) or a school-sponsored "activity" (*e.g.*, school-sanctioned summer program).  By extending the holding of *Davis*, the majority's decision loses any semblance of a connection to the plain—or even strained—reading of Title IX's statutory text.

As explained in Judge Rawlinson's dissent, the University of Arizona had substantial control over Bradford but not the "context" in which the abuse occurred. Judge Rawlinson's dissent points out that the majority effectively conflates the two *Davis* requirements—control over the harasser *and* the context in which the harassment occurs—to find liability by the school.

The majority opinion cobbles together various facts to assert that the school had "substantial control" over the "context" of the abuse.  First, it points out that Bradford could have been expelled under the football team's strict rules.  But the school presumably could expel any student—football player or not—if he committed violence against another student.  In other words, there is nothing materially unique about Bradford's status as a football player to claim that the University had substantial control over the context of the abuse.  And if the ability to expel a student amounts to substantial control over the context, then it is tantamount to vicarious liability because a school can always expel any student committing violent crimes.

Second, the majority opinion argues that the University had substantial control over the "context" of the abuse because Bradford was on a football scholarship. But that is an odd fact to hang a Title IX claim. If a wealthy trust fund student assaults a classmate in his luxury apartment, would there be no Title IX liability for the school just because his parents are paying full tuition?

Finally, the majority opinion stresses that football players must receive permission to live off campus. Judge Rawlinson's dissent explains why that does not amount to substantial control over the context of the abuse under *Davis*. But stepping back to see the big picture, I do not think it should make much difference under the *Davis'* "context" prong whether Bradford had the luxury of living off campus. Certainly, under the facts of *Davis,* the context prong was met: The harassment occurred in the classroom (and not, say, a shopping center), putting teachers directly on notice of the abuse and allowing them to stop it. But when it comes to physical violence in this case, I question whether it matters that it occurred in a dormitory room or an off-campus house. Unlike the classroom or a schoolyard, dormitory rooms and off-campus houses are private, so school officials do not directly observe what happens in those rooms and are not on notice of what may occur there. It thus seems odd to say that whether abuse occurred in a dorm room or an off-campus house should affect the school's liability.

But we are stuck with the *Davis* test, and we must apply it. And under the logic of *Davis*, the school did not have "substantial control" over the context of the abuse occurring in an off-campus house. This case reminds us of what happens when courts tinker with statutes to reach a seemingly just result in a particular case. No longer tethered

to the text, courts fashion an amorphous multi-factor test that leads to a fair outcome in a specific case (like in *Davis*). We, however, have to live with the judicially concocted test that we create. And when we have to apply that test to other factual scenarios, it may make little sense (like in this case).

This is an awful case with horrendous facts. But I do not think it is a Title IX case under the text of the statute or under *Davis*' judicially created test. I thus respectfully dissent.